The State of Ohio, Appellee, v. Hancock, Appellant.

[Cite as *State v. Hancock,* 108 Ohio St.3d 57, 2006-Ohio-160.]

(No. 2003–2099—Submitted June 28, 2005—Decided February 1, 2006.)

Moyer, C.J.

{¶ 1} Appellant, Timothy Hancock, was an inmate at the Warren Correctional Institution in Lebanon, Ohio, serving a life sentence for a 1990 aggravated-murder conviction. On November 13, 2000, within hours after Jason Wagner became Hancock's cellmate, Hancock strangled him to death. Hancock appeals his aggravated-murder conviction and his death sentence.

The Murder of Jason Wagner

{¶ 2} On November 13, 2000, Hancock and Wagner were housed in the protective custody ("PC") unit at Warren Correctional Institution. Hancock was in a "segregation" cell within the PC unit. These cells are generally used to discipline PC inmates for violating rules. They may hold either one or two inmates.

{¶ 3} A policy of the Department of Rehabilitation and Correction ("DRC") required that before any inmate in the segregation unit could be placed in the same cell as another inmate, the inmate's file had to be reviewed to determine whether he had a "separation" from his prospective cellmate. The term "separation," although not explained at trial, appears to mean a document or notation in an inmate's file indicating that he is not to be assigned to the same cell as another inmate.

{¶ 4} Around noon on November 13, 2000, Sergeant Joseph Gross was ordered to move Wagner to a segregation cell. According to Gross, he "checked all the files and everything to make sure [Wagner] didn't have [any] separations from other inmates in the segregation unit." Wagner's file did not contain a separation from Hancock. Only three segregation-unit inmates other than Hancock lacked cellmates, but Gross considered them unsuitable to share a cell with Wagner, so Hancock's cell was the only feasible place to put Wagner.

{¶ 5} The shift supervisor, Captain Daniel Dane, went to the segregation unit and spoke with Hancock and Wagner. According to Dane, Hancock said he had no objection to sharing a cell with Wagner. Hancock spoke rationally, responded

reasonably to questions, and did not appear to be acting abnormally. Nor did Wagner express any objection to sharing a cell with Hancock. Dane reviewed the unit file and the master file and found no separation notation for Wagner and Hancock. Wagner was then placed in Hancock's cell.

{¶ 6} At approximately 10:30 p.m., Corrections Officer David Kohlhorst began to conduct his first head count of the third shift. When he checked Hancock's cell, the cell light was off. Hancock told Kohlhorst that Wagner was asleep. Kohlhorst shined his flashlight into the cell and asked Hancock to lift the towel from Wagner's head so he could see Wagner. Hancock complied. After a brief conversation with Hancock, Kohlhorst moved on.

{¶ 7} At about 11:45 p.m., Kohlhorst began the second head count of the shift. As he entered the PC unit, he heard a banging noise. Kohlhorst assumed that the noise was coming from an inmate named Jones, who had created a disturbance earlier. Kohlhorst said: "Jones, * * * [d]o you need a nurse again?" Hancock replied, "No, we don't need a nurse, we need a coroner. I killed this child molesting m* * * * * f* * * * *." Approaching Hancock's cell, Kohlhorst saw Wagner lying on the top bunk, bound hand and foot, with a strip of bedsheet around his neck. Kohlhorst set off his "man down" alarm and left the area.

{¶ 8} Highway Patrol investigators were summoned to the prison at 12:30 a.m., November 14. When they examined Wagner's body, they found a cloth ligature wrapped around his neck and knotted over his throat. There was a mark on the top of Wagner's head where it had been pressed against the headboard of the bed.

{¶ 9} The investigators also examined the bindings that secured Wagner to the bed. A long strip of cloth had been tied around Wagner's right wrist, pulled under the bed, and threaded up through a hole in the bottom of the bed so that it ran directly underneath the mattress from right to left. It had then been threaded down through another hole in the bottom of the bed and pulled up over the left side, where it was tied around Wagner's left wrist. Wagner's ankles were tied to the bed in the same way.

{¶ 10} An autopsy showed that Wagner had died of ligature strangulation. The ligature had been wrapped at least three times around his neck and knotted twice. When tightened, it left an abrasion, or "ligature furrow," around Wagner's neck. The angle of the furrow indicated that Wagner had been strangled from above. Wagner also had bruises on his face, neck, and scalp.

### Hancock's Statements to Investigators

{¶ 11} Hancock confessed several times to killing Wagner. On November 14, 2000, he was questioned by State Troopers Nelson Holden and Jim Slusher. He told Holden and Slusher that he was not supposed to have a cellmate, had angrily

resisted Wagner's assignment to his cell, and had acquiesced only after Sergeant Gross threatened him with Mace. He said that he had decided to beat up Wagner in order to force his removal from the cell. However, he also claimed that he had attacked Wagner and tied him to the bed only after Wagner made a sexual advance toward him. Even then, Hancock claimed, he had not been planning to kill Wagner. But Hancock lost his temper and choked Wagner to death after Wagner "started talking shit," as Hancock put it. (Hancock claimed that he could not remember what Wagner had said to provoke him.)

{¶ 12} According to Hancock, before the assault, Wagner had told him about molesting a little girl and hiding her in an attic without food or water for three days. But Hancock admitted that this was not his real reason for assaulting Wagner: "I think I more or less used her [Wagner's victim] as a crutch or excuse to just let my hands * * * fly loose because in my mind I'm thinking to myself, 'I bet they don't put another m* * * * * f* * * * * * [cellmate] in my house from now on.'"

{¶ 13} On November 16, Hancock discussed the murder with Chae Harris, the institutional investigator at Warren Correctional Institution. Hancock told Harris a story different from what he had told Holden and Slusher. In this version, Hancock said that he decided to kill Wagner because Wagner had boasted about raping the little girl.

{¶ 14} Hancock also admitted to Harris that he had tricked Wagner into submitting to restraints. Hancock told Wagner that he wanted "to get his status increased" to obtain a transfer to another institution. Hancock therefore proposed that he pretend to take Wagner hostage, tie him to the bed, and choke him until the guards intervened. According to Hancock, Wagner agreed to help stage this scene in exchange for Hancock's sweat suit.

{¶ 15} Around 7:00 p.m., Hancock and Wagner began to tear bedsheets into strips. They laced the strips through the holes in the bottom of the bed, as described above. Wagner then got into bed, and Hancock tied his feet and left hand, leaving his right hand free. When Officer Kohlhorst conducted his first head count, he asked Hancock, "Where's your [cellmate]?" Hancock lifted the towel from Wagner's head, Wagner waved his free hand, and Hancock replaced the towel.

{¶ 16} After Kohlhorst moved on, Hancock secured Wagner's hand. Hancock then wound a sheet around Wagner's neck. Wagner said, "You're not going to kill me, are you?" Hancock said, "No." He then began strangling Wagner, instructing him to signal by tapping on the bed if the sheet was too tight. When Wagner tapped, Hancock initially loosened the sheet. But then he tightened it again and strangled Wagner for about ten minutes until Wagner stopped moving.

{¶ 17} When Hancock loosened the sheet a second time, Wagner gasped. Hancock hit him eight or nine times in the windpipe. Then he checked Wagner for a pulse. Finding none, Hancock sat down to have a cigarette and a cup of coffee. Then he got up and told the inmate in the next cell what he had done.

{¶ 18} On November 17, Hancock told the highway patrol troopers essentially the same story he had recounted to Harris. Hancock admitted to Trooper Holden and Sergeant Jim Ertel that he had begun to plan the murder about four or five hours before committing it. He explained how he had tricked Wagner, but also admitted that he had assaulted Wagner before proposing the hostage enactment and that Wagner's fear was what made him agree to cooperate when Hancock tied him up.

{¶ 19} Hancock said that Wagner's boasting was "pretty much" the reason he had killed him. However, he also made a vague reference to "other things going on in my life" and said, "I just get frustrated."

## Charges and Plea

{¶ 20} Hancock was indicted on one count of aggravated murder under R.C. 2903.01(A) (prior calculation and design). Two death specifications were attached: R.C. 2929.04(A)(4) (murder by inmate under detention) and R.C. 2929.04(A)(5) (prior murder conviction).

{¶ 21} Hancock pleaded not guilty by reason of insanity. At trial, the defense conceded that Hancock had tied up Wagner and strangled him to death. In addition to pursuing the insanity defense, the defense contested the state's evidence of prior calculation and design.

## Evidence on Sanity

{¶ 22} At trial, Hancock presented the testimony of Dr. Glenn Weaver, a forensic psychiatrist, to prove his insanity plea. Weaver testified that there was "[n]o question whatsoever" that Hancock had a long-standing, ongoing, and serious mental illness. Moreover, Hancock had "most certainly" been afflicted with that illness on November 13, 2000, when he killed Wagner.

{¶ 23} Weaver found that Hancock was paranoid and had fixed delusional beliefs. According to Weaver, Hancock believed that he was an angel of God. Hancock also believed that another angel, "Murray," who had been with him for years, was giving him directions.

{¶ 24} Weaver did not believe that Hancock was feigning mental illness. Indeed, Weaver thought it was probably impossible to feign mental illness for more than ten years, i.e., since Hancock's 1990 diagnosis of a major psychiatric disorder. Weaver also noted that the staff at Oakwood Forensic Center had

continued to prescribe medication despite having concluded that Hancock was feigning, which was inconsistent with their conclusion.

{¶ 25} Weaver concluded that Hancock knew that he was choking Wagner, but did not appreciate the consequences of that act, i.e., that it would lead to prosecution and punishment. Weaver noted that Hancock did not attempt to conceal the murder. According to Weaver, Hancock believed that Wagner was a "disciple of Satan."

{¶ 26} The state presented the testimony of Dr. Douglas Lehrer, a forensic psychiatrist, who had conducted a court-ordered examination of Hancock pursuant to R.C. 2945.371. Lehrer's interviews with Hancock supported the conclusion that Hancock was malingering. Lehrer administered a Structured Interview of Reported Symptoms ("SIRS") test, which is designed to detect feigning of mental illness. The results of the SIRS test also indicated malingering. Dr. Kenneth Washington, a prison psychologist who "had examined Mr. Hancock a number of times over the years," told Lehrer that Hancock as much as admitted that "Murray" was an invention of his mind.

{¶ 27} Dr. Lehrer concluded that Hancock was malingering and had not been suffering from any severe mental disease or deficiency when he strangled Wagner.

## Verdict and Sentence

{¶ 28} The jury found Hancock guilty of aggravated murder with a specification of murder by a prisoner under detention. The prior-murder-conviction specification was tried to the court, which found Hancock guilty of that specification as well.

{¶ 29} After the penalty phase, the jury recommended a death sentence. However, before sentencing, the trial court learned that several exhibits, admitted in the guilt phase but excluded from the penalty phase, had been inadvertently sent to the jury room during the penalty-phase jury deliberations. These included the crime-scene photographs, the ligatures used to tie Wagner to the bed and strangle him, and Hancock's statements to investigators. Finding that the admission of these exhibits constituted outside communication and was presumptively prejudicial, the trial court declared a mistrial of the penalty phase and—expressly declining to weigh the aggravating circumstances against the mitigating factors—sentenced Hancock to life imprisonment without the possibility of parole.

## Appeal, Remand, and Resentencing

{¶ 30} The state filed a motion for leave to appeal the trial court's decision granting a mistrial in the penalty phase. The Court of Appeals for Warren

County granted the motion. On appeal, the court of appeals held that the trial judge had erred by excluding the guilt-phase exhibits from the penalty phase; therefore, the submission of those exhibits to the jury was not a proper ground for mistrial. Accordingly, the court of appeals vacated the life sentence and remanded for resentencing. *State v. Hancock*, Warren App. Nos. CA2001–12–115, CA2001–12–116, and CA2002–01–004, 2003-Ohio-1616, 2003 WL 1689612.

{¶ 31} On remand, the trial court found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and sentenced Hancock to death. Hancock appeals directly to this court as a matter of right.

{¶ 32} We conclude that no reversible error attached to the guilt phase of Hancock's trial. However, the erroneous submission of the excluded exhibits to the jury during penalty-phase deliberations invalidated the jury's recommendation of death. We therefore vacate the death sentence in this case and remand for further proceedings.

## I. Guilt–Phase Issues

### A. Sufficiency and Weight of Evidence

{¶ 33} In his eighth proposition of law, Hancock claims that his conviction was based on legally insufficient evidence. Hancock does not deny that the state adduced evidence sufficient to prove every element of aggravated murder beyond a reasonable doubt. However, he claims that his conviction violated due process because he introduced "overwhelming" evidence to support his insanity defense.

{¶ 34} On review of the sufficiency of the evidence to support a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 35} The defendant's sanity is not an element of the offense of aggravated murder. The state need not prove, in a prosecution for aggravated murder, that the defendant was sane. To the contrary, insanity is an affirmative defense. *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 64; R.C. 2901.01(A)(14). "[T]he burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2901.05(A). The accused must persuade the trier of fact that "at the time of the commission of the offense, the [accused] did not know, as a result of a severe mental disease or defect, the wrongfulness of the [accused's] acts." R.C. 2901.01(A)(14).

{¶ 36} Courts have divided over whether and how sufficiency-of-the-evidence review under *Jackson v. Virginia* applies to affirmative defenses. Some courts hold that evidence is legally insufficient to convict if no rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have

*failed* to find that the defendant established his affirmative defense by the required degree of proof. See *United States v. Barton* (C.A.5, 1993), 992 F.2d 66, 68–69; *United States v. Martin* (C.A.A.F., 2001), 56 M.J. 97, 107; *State v. Roy* (La.1981), 395 So.2d 664, 669; *State v. Flake* (Tenn.2002), 88 S.W.3d 540, 554.

{¶ 37} However, the United States Court of Appeals for the Sixth Circuit has held that *Jackson* does not apply to affirmative defenses at all. "[A] defendant may be convicted of a crime in accordance with due process strictures 'upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." *Caldwell v. Russell* (C.A.6, 1999), 181 F.3d 731, 740, abrogated on other grounds by the Antiterrorism and Effective Death Penalty Act, Section 2261 et seq., Title 28, U.S.Code (see *Mackey v. Dutton* (C.A.6, 2000), 217 F.3d 399, 406). See, also, *Allen v. Redman* (C.A.6, 1988), 858 F.2d 1194, 1196–1198.

{¶ 38} We find this analysis persuasive. *Jackson* addresses the sufficiency of the state's evidence, not the strength of defense evidence. The *Jackson* standard of review "must be applied with explicit reference to the *substantive elements of the criminal offense as defined by state law.*" (Emphasis added.) *Jackson,* 443 U.S. at 324, 99 S.Ct. 2781, 61 L.Ed.2d 560, fn. 16. The insanity defense does not involve "the substantive elements of the criminal offense." Accordingly, we reject Hancock's claim of insufficient evidence.

{¶ 39} Hancock also contends that the verdict of the jury was against the manifest weight of the evidence. See, generally, R.C. 2953.02; *State v. Smith* (1997), 80 Ohio St.3d 89, 102–103, 684 N.E.2d 668. A court considering a manifest-weight claim "review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. The question is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." Id. See, also, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541.

{¶ 40} We reject Hancock's contention that "overwhelming evidence" supports his insanity defense. Although the defense expert concluded that Hancock was insane at the time of the offense, the court-appointed examiner concluded that he was malingering. Hancock's mental health history reflects similar disagreement. Doctors at Warren Correctional Institution repeatedly sent him to Oakwood Forensic Center, a psychiatric facility, to be treated for mental disorders. But

Oakwood staff repeatedly sent him back to Warren because extensive observation led them to conclude that his disorders were feigned.

{¶ 41} Hancock's confessions, however, strongly suggest that he understood the wrongfulness of strangling Wagner. On November 14, 2000, Hancock said to investigators: "Should the boy have died? F* * * no. I don't care what crime he did. It's not on me to be judge and jury. * * * I'm guilty as f* * *." Three days later, he said: "I know what I got facing me. * * * I shouldn't have did what I did." During the same conversation, he said: "I know I've done wrong and I know I'm going to get my a* * punished for it * * *." Finally, he said: "I know what I'm facing * * *. Your prosecutor is going for agg murder and you know what that means."

{¶ 42} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. This is not such a case. The evidence—to say the least—does not weigh heavily in favor of finding insanity. We overrule Hancock's eighth proposition of law.

### B. Evidence of Victim's Criminal Record

{¶ 43} In his 14th proposition, Hancock contends that the trial court improperly excluded evidence of Wagner's criminal record.

{¶ 44} Before trial, the state filed a motion in limine to exclude evidence of Wagner's criminal record. At a hearing on the motion, the defense agreed that Wagner's criminal record was irrelevant, but contended that Wagner's statements to Hancock about his crimes were relevant because Dr. Weaver had partly based his opinion of Hancock's sanity on them. The defense therefore requested that the trial court allow evidence of Wagner's statements.

{¶ 45} The trial court ruled that Wagner's statements to Hancock were admissible, but substantive evidence of Wagner's criminal record was inadmissible. At trial, Wagner's statements to Hancock about his crimes were introduced and extensively discussed. However, the defense never proffered substantive evidence of Wagner's criminal record, such as a certified copy of a judgment of conviction.

{¶ 46} Hancock now claims that substantive evidence of Wagner's criminal record was relevant to corroborate Hancock's claim that Wagner had boasted about committing these crimes.

{¶ 47} However, Hancock failed to preserve this issue at trial. At the hearing on the motion in limine, he never contended that *substantive evidence* of Wagner's criminal record should be admitted; the defense was solely interested in using Wagner's *statements* regarding his criminal record. Nor did Hancock proffer any substantive evidence of Wagner's criminal record at trial. See *State*

*v. Grubb* (1986), 28 Ohio St.3d 199, 202–203, 28 OBR 285, 503 N.E.2d 142 (ruling in limine does not preserve admissibility issue for appeal; party prevented from introducing evidence must nonetheless proffer it at trial). We therefore overrule Hancock's 14th proposition of law.

## C. Claimed Violation of R.C. 2945.371(J)

{¶ 48} Dr. Lehrer, who conducted a court-ordered mental examination pursuant to R.C. 2945.371, testified in rebuttal to Hancock's insanity defense. During Lehrer's direct examination at trial, the prosecutor asked: "Did [Hancock] tell you specifically how he caused the death of Jason Wagner, what he did?" Lehrer testified: "He told me that he tied him up and strangled him."

{¶ 49} In his 15th proposition of law, Hancock contends that this testimony violated R.C. 2945.371(J), which provides: "No statement that a defendant makes in an evaluation * * * under divisions (A) to (H) of this section relating to the defendant's * * * mental condition at the time of the offense charged shall be used against the defendant on the issue of guilt in any criminal action or proceeding * * *." This provision permits a defendant's statements during a court-ordered mental evaluation to be used against him on the issue of the defendant's mental condition (e.g., insanity), but prohibits their use to prove the defendant's factual guilt. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 31–32, 544 N.E.2d 895 (construing predecessor statute, former R.C. 2945.39(D)). Hancock argues that his admission to Lehrer that he had tied Wagner up and strangled him must have been "used against [him] on the issue of guilt" in violation of R.C. 2945.371(J) because it was irrelevant to the insanity defense.

{¶ 50} We disagree. Hancock's admission to Lehrer *was* relevant to the insanity defense. Shortly before the testimony at issue, Lehrer had testified that Hancock was not suffering from a serious mental disease or defect when he killed Wagner. In reaching that conclusion, Lehrer had considered "statements made to me or others that indicate his capacity to know the gravity of his situation and the potential wrongfulness of the acts in question." Hancock's admission to Lehrer was relevant to "his capacity to know the wrongfulness of" killing Wagner: the admission indicated that, when he strangled Wagner, he knew what he was doing.

{¶ 51} Moreover, the admission was not used against Hancock on the issue of factual guilt. Before Lehrer gave the testimony at issue, the trial judge expressly instructed the jury *not* to consider Hancock's admission to Lehrer for that purpose:

{¶ 52} "Should the doctor in the course of his narrative or response to the prosecutor's question reveal any information that you feel would be incriminating regarding the Defendant's conduct [on] November 13 of 2000, please bear in mind

that the information the doctor receives is only given for purposes of his evaluation of Mr. Hancock as to whether or not he was suffering a severe mental disease or defect at the time of the incident and whether or not he knew the wrongfulness of his act; however, it's not offered on the issue of guilt or innocence.

{¶ 53} "And you're not to accept any comment or statements that Mr. Hancock might have given to the doctor and the doctor may repeat to you as [a]ffecting any determination as to whether or not Mr. Hancock is guilty or innocent."

{¶ 54} It is presumed that the jury obeys the instructions of the trial court. *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 147. Given the above instruction, we must assume that the jury did not consider Hancock's admission to Lehrer with respect to the issue of factual guilt. Nor did the prosecution argue that Hancock's admission was probative of guilt.

{¶ 55} Finally, there was no possible prejudice. Dr. Lehrer repeated Hancock's admission that "he tied [Wagner] up and strangled him." But other evidence overwhelmingly proved that Hancock did just that, and the defense expressly conceded the point at trial. Thus, we overrule Hancock's 15th proposition of law.

### D. Claimed Violation of Doctor–Patient Privilege

{¶ 56} In his 16th proposition of law, Hancock contends that Dr. Lehrer's testimony violated the physician-patient privilege established by R.C. 2317.02(B)(1).[1]

{¶ 57} Hancock concedes that his communications to Dr. Lehrer during the court-ordered examination were not privileged. See *State v. Fears* (1999), 86 Ohio St.3d 329, 343, 715 N.E.2d 136 (privilege attaches only when a doctor is consulted for diagnosis or treatment). However, in evaluating Hancock, Dr. Lehrer talked to Dr. Kenneth Washington, the psychology supervisor at Warren Correctional Institution, and to a Dr. Fernandez, who had examined and treated Hancock after the murder.

{¶ 58} Hancock argues that his communications to Drs. Washington and Fernandez were privileged under R.C. 2317.02(B)(1).[2] Because Dr. Lehrer

---

1. R.C. 2317.02(B)(1) provides that a physician shall not testify "concerning a communication made to the physician * * * by a patient in that relation or the physician's * * * advice to a patient, except as otherwise provided" by R.C. 2317.02(B)(1), (2), and (3), "and except that, if the patient is deemed by [R.C.] 2151.421 * * * to have waived any testimonial privilege under this division, the physician may be compelled to testify on the same subject."

2. Dr. Washington is a psychologist, not a physician, but R.C. 4732.19 places "[t]he confidential relations and communications between a licensed psychologist * * * and client * * * upon the same basis as those between physician and patient under [R.C.] 2317.02[B]."

allegedly relied on information acquired from Washington and Fernandez in forming his opinion of Hancock's sanity, Hancock contends that Lehrer's opinion should have been excluded as deriving from violations of the statutory privilege.

{¶ 59} Hancock failed to object to Dr. Lehrer's testimony on privilege grounds at the time Lehrer testified. The defense did raise the privilege issue by way of a motion in limine asking that Lehrer (along with Washington and Fernandez) be barred from testifying. But "the denial of a motion *in limine* does not preserve a claimed error for review in the absence of a contemporaneous objection at trial." *State v. Hill* (1996), 75 Ohio St.3d 195, 203, 661 N.E.2d 1068. See, also, *State v. Maurer* (1984), 15 Ohio St.3d 239, 259, 15 OBR 379, 473 N.E.2d 768 (notwithstanding motion in limine, objecting party must challenge evidence during trial when issue is presented in full context).

{¶ 60} Hence, absent plain error, this issue is waived. An error is plain error only if the error is obvious, *State v. Sanders* (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. See, also, *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240.

{¶ 61} It is not obvious that Dr. Lehrer's testimony violated the privilege established by R.C. 2317.02(B)(1). R.C. 2317.02(B)(1)—which is in derogation of the common law and must be strictly construed, see *In re Miller* (1992), 63 Ohio St.3d 99, 109, 585 N.E.2d 396—states that a physician shall not *testify* "concerning a communication made *to the physician* * * * by a patient in that relation*." (Emphasis added.) But Lehrer did not testify to any "communication made to the physician"—i.e., to Lehrer—"by a patient"—Hancock—"in that relation"—the relationship between physician and patient. Moreover, R.C. 2945.371(F) provides: "In conducting an evaluation of a defendant's mental condition at the time of the offense charged, the [court-appointed] examiner shall consider all relevant evidence."

{¶ 62} Hence, the trial court's admission of the testimony at issue was not plain error. We overrule Hancock's 16th proposition of law as waived.

### E. Discovery Issues

{¶ 63} Before trial, the defense requested that the trial court order the state to submit a complete copy of its case file to the court. The defense asked that the court review the file for *Brady* material (see, generally, *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215), then seal it for appellate review. The trial court denied the defense motion. In his 13th proposition of law, Hancock contends that his motion should have been granted.

{¶ 64} We have consistently rejected the argument that a trial court must "examine the prosecutor's file to determine the prosecutor's truthfulness or seal the prosecutor's file for purposes of appellate review" on the basis of speculation that the prosecutor *may* have withheld exculpatory evidence. *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 60; see, also, *State v. Chinn* (1999), 85 Ohio St.3d 548, 569, 709 N.E.2d 1166.

{¶ 65} At a pretrial motions hearing, one of Hancock's attorneys stated that "the prison system" possessed undisclosed videotapes from the day of the murder. Hancock claims that these videotapes constituted undisclosed *Brady* material and that the court should have reviewed the prosecution's file to determine whether more such material existed.

{¶ 66} Hancock's claim rests upon multiple layers of speculation. First, Hancock does not substantiate his claim that the state withheld any videotapes containing evidence favorable to the accused and material either to guilt or punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Indeed, trial testimony indicates that the prison's videotaping system was not even operational on November 13, 2000.

{¶ 67} Hancock's inference that the prosecution may have withheld other exculpatory evidence from the defense is equally speculative. The record in fact indicates that the prosecution helped the defense obtain material from the prison. During the motion hearing, defense counsel stated: "I know we have some ongoing issues about some documents and things that are in the possession of the state of Ohio, *at the prison in particular*, that we are attempting to get hold of, and I believe that *the prosecution is attempting to facilitate that for us.*" (Emphasis added.)

{¶ 68} Because Hancock's claim is "purely speculative," *Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶ 60, we overrule his 13th proposition of law.

{¶ 69} In his 11th proposition of law, Hancock contends that he was entitled to review a transcript of the grand jury proceedings.

{¶ 70} Before trial, Hancock filed motions requesting that the grand jury proceedings be transcribed and that he receive a copy of the transcript. The trial court denied Hancock's motions. Hancock contends that the denial was error.

{¶ 71} Hancock was not entitled to inspect grand jury transcripts without showing "a particularized need for disclosure * * * which outweigh[ed] the need for secrecy." *State v. Greer* (1981), 66 Ohio St.2d 139, 20 O.O.3d 157, 420 N.E.2d 982, paragraph two of the syllabus. Hancock's vague and speculative motion did not constitute such a showing. His motion asserted that "it seems apparent" that grand jury witnesses made statements to law enforcement officers that "may"

have been inconsistent with their other statements or "may" have contained other unspecified "exculpatory or impeachment information." The motion failed to identify the witnesses, officers, or statements to which it referred.

{¶ 72} Hancock argues that he had a particularized need for the grand jury transcripts because, during a pretrial motions hearing, prosecutors argued that they had no duty to produce material in the possession of prison authorities. But this argument does not support the inference that the grand jury testimony contained undisclosed *Brady* material. We overrule Hancock's 11th proposition of law.

## F. Jury Instructions

{¶ 73} The trial court instructed the jury on murder as a lesser included offense of aggravated murder. In his 17th proposition, Hancock contends that the court improperly instructed the jury that it could consider the lesser included offense only if it first acquitted him of aggravated murder.

{¶ 74} Absent plain error, Hancock waived this claim at trial by not objecting or requesting a different instruction. "Plain error exists only where it is clear that the verdict would have been otherwise but for the error." *State v. Skatzes,* 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 52. Because the evidence of prior calculation and design was strong in this case, the alleged error was not clearly outcome-determinative.

{¶ 75} Nor is the alleged error obvious. See *State v. Sanders,* 92 Ohio St.3d at 257, 750 N.E.2d 90 (plain error must be obvious as well as outcome-determinative). In *State v. Thomas* (1988), 40 Ohio St.3d 213, 220, 533 N.E.2d 286, we upheld a nearly identical instruction, holding that the instruction at issue was not an "acquittal first" instruction. Moreover, while discussing the verdict forms, the trial court specifically informed the jury, "[*I*]*f you were unable to reach a verdict or a decision* [*on aggravated murder*], *you would consider the lesser included offense of murder.*" (Emphasis added.) Hence, the instruction at issue was not plain error, and the issue is waived.

{¶ 76} In his 20th proposition of law, Hancock claims that the trial court's guilt-phase instructions erroneously defined reasonable doubt. This issue is waived, as Hancock did not object at trial. Moreover, the instructions conformed to R.C. 2901.05(D), whose constitutionality we have repeatedly affirmed. See *State v. Stallings* (2000), 89 Ohio St.3d 280, 293–294, 731 N.E.2d 159; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. We overrule Hancock's 17th and 20th propositions of law.

## G. Prosecutorial Misconduct

{¶ 77} In his 18th proposition of law, Hancock alleges prosecutorial misconduct at trial. Four instances of alleged misconduct were objected to at trial.

{¶ 78} First, during voir dire, the prosecutor asked prospective jurors whether their verdict would be influenced by Wagner's crimes. In pursuing this line of questioning, she stated: "It's still a crime, isn't it, to take another person's life, one person to make himself the executioner of somebody, because that's what it is, * * * it's an execution without the benefit of judge and jury."

{¶ 79} Hancock argues that this statement improperly expressed the prosecutor's personal opinion that Hancock was guilty. On the contrary, the prosecutor was merely trying to discern whether Wagner's crimes would improperly influence any prospective juror's determination of Hancock's guilt or innocence. Moreover, Hancock himself, in his November 13 interrogation, said that he had "executed that boy." Thus, the prosecutor's comment was not prejudicial.

{¶ 80} Second, during the guilt-phase closing argument, in discussing Wagner's crimes, the prosecutor stated: "Nobody likes sexual molesters or child molesters and I prosecute my share of them, believe me." A defense objection was sustained, and the trial judge admonished the prosecutor: "Don't editorialize, please. Stick to what the evidence shows."

{¶ 81} The prosecutor's implied argument was simply that the jury should not acquit Hancock simply because his victim was a bad person. Moreover, the judge's rebuke minimized any prejudicial effect the statement may have had. Thus, the prosecutor's expression of distaste for Wagner was not "so fundamentally unfair as to deny [Hancock] due process." *Donnelly v. DeChristoforo* (1974), 416 U.S. 637, 645, 94 S.Ct. 1868, 40 L.Ed.2d 431.

{¶ 82} Third, during cross-examination of Dr. Weaver, the defense expert witness, the following exchange took place:

{¶ 83} "Q. [Prosecutor] Are psychological illnesses or mental illnesses something that you can measure mathematically or finitely?

{¶ 84} "A. No. I wish we could.

{¶ 85} "Q. Okay. Me too. We'd probably have a better determination of what was going on with this Defendant then, wouldn't we?"

{¶ 86} The trial court sustained an objection and instructed the jury to "disregard the comments of counsel." Since the jury is presumed to follow its instructions, there is no basis for finding prejudice. *Fears*, 86 Ohio St.3d at 334, 715 N.E.2d 136.

{¶ 87} Fourth, Hancock contends that the prosecutor elicited inflammatory and irrelevant "other acts" evidence when a state's witness testified that Hancock was in a segregation unit because of past disciplinary infractions. Defense counsel objected, and the judge admonished the jury to disregard the statement. Again, a jury is presumed to follow the judge's instructions. Id.

{¶ 88} Hancock complains of other instances of guilt-phase prosecutorial misconduct. However, he failed to object to these at trial. We do not find that any of these misconduct claims amounted to plain error. They are therefore waived by Hancock's failure to object.

{¶ 89} Finally, Hancock contends that the prosecution committed misconduct in the penalty phase. Because we are vacating Hancock's death sentence and remanding for a new penalty determination, this issue is moot.

{¶ 90} We overrule Hancock's 18th proposition of law.

### H. Ineffective Assistance

{¶ 91} In his 22nd proposition of law, Hancock claims that his counsel rendered ineffective assistance.

{¶ 92} On November 14, 2000, Hancock told Troopers Holden and Slusher that he was serving a sentence of "24 to life." Hancock argues that his counsel should have asked the court to delete this reference from the interview tape, because learning that "Hancock was in prison for a serious offense * * * encouraged the jury to draw an improper propensity inference."

{¶ 93} We disagree. The prosecutor's closing arguments neither discussed Hancock's sentence nor argued propensity. Moreover, the jury already knew from the evidence that Hancock was in prison, and the prosecutor did not tell the jury that Hancock's previous crime was murder (the prior-murder specification was tried to the judge). Finally, Hancock did not contest that he had killed Wagner. Thus, the failure to delete the statement regarding Hancock's sentence does not meet the standard for prejudice enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 693–696, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 94} Hancock claims that his counsel should have objected to the following alleged instances of prosecutorial misconduct in the state's guilt-phase closing argument. First, the prosecutor said:

{¶ 95} "Remember when we first spoke and I told you this case was about Timothy Hancock, the Defendant. Now you've had the opportunity to hear the evidence and I submit to you that I was right. This case is only about Timothy Hancock, the Defendant. It's not about other inmates, it's not about the Warren Correctional Institut[ion] or any guards there or claims about abuse when a teenager or even about a Murray.

{¶ 96} "This case is about the Defendant and his decision to kill Jason Wagner * * *. That's what this case is about."

{¶ 97} Hancock says that this was an improper expression of personal opinion. We disagree. In our view, it was an attempt to focus the jury on the evidence

and the relevant issues. It did not render the trial fundamentally unfair. Thus, Hancock was not prejudiced by his counsel's failure to object.

{¶ 98} Second, the prosecutor characterized Hancock as a "liar" (twice), a "manipulator" (twice), an "antisocial personality," and a "malingerer." The prosecutor also accused Hancock of "bend[ing] the truth to make it fit his theory of the case."

{¶ 99} Hancock argues that these were irrelevant attacks on his character. Yet Hancock admits that his credibility was "central" to his insanity defense. Hence, the prosecutor was entitled to attack his credibility. Moreover, the prosecutor's characterizations were supported by the evidence. Hancock's mental-health history showed repeated instances of feigning mental illness. Dr. Lehrer testified that, in his opinion, Hancock was malingering and had an antisocial-personality disorder. Hancock's expert witness, Dr. Weaver, admitted that "some of [Hancock's] behavior could be attributed to manipulation."

{¶ 100} Third, the prosecutor said: "You heard that he's in the segregation unit. Well, he's in a segregation unit because he asked for—we don't know that, but we know that people are put in segregation because they are disruptive or they break the rules and regulations, and there are people who want to be in there, and there are people in there who break the rules and regulations and that's why they're in segregation." Hancock argues that this comment improperly suggested that he had a propensity to break laws and rules.

{¶ 101} However, the prosecutor did not use Hancock's presence in the segregation unit to show propensity. Instead, she used it to show motive. Her statement that some inmates want to be in segregation was made in support of the state's theory that Hancock had killed Wagner because he "want[ed] a private room."

{¶ 102} Finally, the prosecutor told the jury: "You're not judging Jason Wagner. You didn't hear the evidence on Jason Wagner. You only heard what the Defendant said he said, and we all know that the Defendant lies. You can't read or listen to two pages of his testimony [sic] without realizing that this Defendant is a liar and now he wants you to believe that he didn't really do this with prior calculation and design * * *."

{¶ 103} Hancock accuses the prosecutor of misleading the jury with this "factually untrue" argument, because the prosecution was "well aware of Wagner's crimes." However, the prosecutor did not deny that Wagner had committed crimes. Wagner's crimes were not relevant to the case; what was relevant was whether Wagner had bragged to Hancock about his crimes. The prosecutor was (a) pointing out that Wagner's crimes were irrelevant ("You're not judging Jason Wagner") and (b) arguing that the jury need not accept Hancock's version

of what Wagner said to him in the cell ("You only heard what the Defendant said he said"). Neither argument was untrue or misleading.

{¶ 104} Hancock contends that his counsel should have objected to jury instructions on reasonable doubt and the lesser included offense. The reasonable-doubt instruction was not objectionable. The lesser-included-offense instruction was not an "acquittal first" instruction and did not prejudice the defense. See *State v. Thomas,* 40 Ohio St.3d at 220, 533 N.E.2d 286.

{¶ 105} Hancock's 22nd proposition of law is overruled.

{¶ 106} In his tenth proposition of law, Hancock contends that the state denied him effective assistance of counsel because prison authorities did not permit Hancock to use the telephone to speak with defense counsel.

{¶ 107} Hancock was held, pending trial, at the Lebanon Correctional Institution in Warren County. The trial court ordered that the DRC continue to hold Hancock "at an institution * * * local to the Warren County, Ohio area until the trial." It appears from the record that he remained at the Lebanon Correctional Institution.

{¶ 108} Hancock filed a pretrial motion to permit telephone contact between him and his counsel. At a hearing on the motion, defense counsel asserted that prison authorities had not permitted telephone contact between them and Hancock. Counsel stated that it was difficult, sometimes "almost impossible," to visit Hancock at the prison "on the spur of the moment." Nevertheless, counsel conceded that *"we certainly can get out to see him."* (Emphasis added.) The trial court denied the motion.

{¶ 109} Undoubtedly, it would have been more convenient for Hancock's counsel to have been allowed to speak to him over the telephone. Nevertheless, "[n]ot every restriction on counsel's time or opportunity * * * to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy* (1983), 461 U.S. 1, 11, 103 S.Ct. 1610, 75 L.Ed.2d 610. "[T]here is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic* (1984), 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657, fn. 26.

{¶ 110} Hancock points to no specific attorney errors that resulted from the denial, and he makes no showing of prejudice. Instead, he compares his situation to that faced by the defendant in *Geders v. United States* (1976), 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592. *Geders* held that the defendant had been denied effective assistance of counsel when the trial court forbade him to speak to his attorney during a 17–hour overnight recess. The defendant in *Geders* was not required to show prejudice because " '[a]ctual or constructive denial of the

assistance of counsel *altogether,'* *Strickland v. Washington* [466 U.S. at 692, 104 S.Ct. 2052, 80 L.Ed.2d 674], is not subject to the kind of prejudice analysis that is appropriate in determining whether the quality of a lawyer's performance itself has been constitutionally ineffective." (Emphasis added.) *Perry v. Leeke* (1989), 488 U.S. 272, 280, 109 S.Ct. 594, 102 L.Ed.2d 624 (discussing *Geders* ).

{¶ 111} This case is not analogous to *Geders,* however. The trial judge in *Geders* completely "cut off communication" between lawyer and client "about anything" during the overnight recess. *Geders,* 425 U.S. at 91, 96 S.Ct. 1330, 47 L.Ed.2d 592. But Hancock's communication with his attorneys was not completely cut off. Defense counsel conceded that they could visit him at the prison. Distance was no obstacle, as both counsel practiced in Warren County, where the prison was located. Counsel could also have communicated with Hancock by mail.

{¶ 112} We have rejected attempts to extend *Geders* to cases involving less than a sustained deprivation of all access to counsel. In *State v. Coleman* (1999), 85 Ohio St.3d 129, 143–144, 707 N.E.2d 476, and *State v. Sanders,* 92 Ohio St.3d at 276–278, 750 N.E.2d 90, defendants were incarcerated before trial in locations where it was inconvenient for their lawyers to visit them. But in neither case was counsel denied access to the defendant. *Coleman,* 85 Ohio St.3d at 143–144, 707 N.E.2d 476; *Sanders,* 92 Ohio St.3d at 276, 750 N.E.2d 90. And in neither case did we presume that the defendant had suffered prejudice. See *Coleman,* 85 Ohio St.3d at 144, 707 N.E.2d 476; *Sanders,* 92 Ohio St.3d at 277, 750 N.E.2d 90.

{¶ 113} The trial court's denial of telephone access to counsel does not "approach the magnitude necessary to relieve [Hancock] of his *Strickland* burden to show" that he was deprived of access to counsel in a way that "caused prejudice to his case." Id. at 278, 750 N.E.2d 90. Hancock's tenth proposition of law is therefore overruled.

{¶ 114} We find no reversible error in the guilt phase of Hancock's trial and affirm his conviction of the aggravated murder of Jason Wagner.

## II.  Sentencing Issues

{¶ 115} Hancock challenges the validity of the death sentence imposed by the trial court on remand from the court of appeals.

### A.  Jurisdiction of the Court of Appeals

{¶ 116} In his third proposition of law, Hancock contends that the judgment of the court of appeals vacating his life sentence is void because that court lacked jurisdiction over the state's appeal. However, R.C. 2945.67(A) states:

{¶ 117} "A prosecuting attorney * * * may appeal as a matter of right any decision of a trial court in a criminal case, * * * which decision grants a motion to dismiss all or any part of an indictment, * * * a motion to suppress evidence, or a motion for the return of seized property[,] or grants post conviction relief * * *, and *may appeal by leave of the court* to which the appeal is taken *any other decision,* except the final verdict, of the trial court in a criminal case * * *. *In addition to any other right to appeal under this section* or any other provision of law, a prosecuting attorney * * * may appeal, in accordance with [R.C.] 2953.08 * * *, a sentence imposed upon a person who is convicted of or pleads guilty to a felony." (Emphasis added.)

{¶ 118} The "any other decision" language of R.C. 2945.67(A) provided the court of appeals with jurisdiction to allow the state's motion for leave to appeal. See *State ex rel. Cleveland v. Calandra* (1980), 62 Ohio St.2d 121, 16 O.O.3d 143, 403 N.E.2d 989, overruled on other grounds, *State ex rel. LTV Steel Co. v. Gwin* (1992), 64 Ohio St.3d 245, 248–249, 594 N.E.2d 616; *State ex rel. Leis v. Outcalt* (1980), 62 Ohio St.2d 331, 16 O.O.3d 392, 405 N.E.2d 725. Hancock's third proposition of law is therefore overruled.

### B. Exclusion of Guilt–Phase Evidence from Penalty Phase

{¶ 119} The court of appeals in the original appeal held that the trial judge had abused his discretion by excluding most guilt-phase exhibits from the penalty phase. Because the exclusion of those exhibits was itself improper, the court of appeals reasoned, the inadvertent submission of the excluded exhibits to the jury during its penalty-phase deliberations was not a proper ground for declaring a mistrial and imposing a life sentence. Accordingly, the court of appeals vacated the life sentence and remanded for resentencing. *State v. Hancock,* 2003-Ohio-1616, ¶ 20–33.

{¶ 120} In his first proposition of law, Hancock argues that the imposition of a death sentence on remand was erroneous because the trial court did *not* abuse its discretion in the penalty phase when it excluded the guilt-phase exhibits in question. We agree. For the reasons that follow, we conclude that the trial court acted within its discretion by excluding the exhibits.

{¶ 121} "R.C. 2929.03(D)(1) 'permit[s] repetition of much or all that occurred during the guilt stage.' " *Fears,* 86 Ohio St.3d at 345–346, 715 N.E.2d 136, quoting *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542. See, also, *State v. Foust,* 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 157. In *State v. DePew,* we held that "the prosecutor, at the penalty stage of a capital proceeding, may introduce, ' * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing.' " Id. at 282, 528 N.E.2d 542, quoting R.C. 2929.03(D)(1). However, the statute does not compel the trial court to admit guilt-phase evidence wholesale into the penalty phase. Instead, the trial court is "required to determine what evidence is

relevant" in the penalty phase. *State v. Getsy* (1998), 84 Ohio St.3d 180, 201, 702 N.E.2d 866.

{¶ 122} In exercising that responsibility, trial judges are clothed with broad discretion. See *State v. Sanders,* 92 Ohio St.3d at 259, 750 N.E.2d 90; *State v. Dixon,* 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 67–68. "[I]t is the trial court's province to determine whether, under the circumstances, testimony is 'essentially misleading or too remote' to be deemed relevant. *Whiteman v. State* (1928), 119 Ohio St. 285, 298, 164 N.E. 51." *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 35. A reviewing court must be "slow to interfere" with the trial court's exercise of that discretion. *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 38 O.O.2d 298, 224 N.E.2d 126 (rejecting challenge to trial court's exclusion of evidence as irrelevant). Thus, a trial court's decision to admit or exclude evidence "will not be reversed unless there has been a clear and prejudicial abuse of discretion." *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 407 N.E.2d 490.[3]

{¶ 123} The court of appeals held that the exhibits in question were relevant to "show the nature and circumstances of the * * * aggravating circumstance and as rebuttal evidence to Hancock's asserted mitigating factor that he was under duress/coercion/strong provocation." *State v. Hancock,* 2003-Ohio-1616, 2003 WL 1689612, at ¶ 31. See, also, id. at ¶ 29–33.

{¶ 124} However, the court of appeals never explained how the exhibits were relevant to the aggravating circumstance that the murder was committed by an inmate under detention.

{¶ 125} The court of appeals held, and the state argues here, that the exhibits in question were relevant to rebut the existence of "duress, coercion, or strong provocation," R.C. 2929.04(B)(2). *State v. Hancock,* 2003-Ohio-1616, 2003 WL 1689612, at ¶ 30–32. The state contends that the photographs and ligatures show that Hancock "was not fearful or forced into his actions." But Hancock never claimed at trial that he was "fearful or forced into his actions."

{¶ 126} Finally, the state argues that the exhibits in question were admissible in the penalty phase because they were relevant to the nature and circumstances of the aggravated murder.

{¶ 127} We have said that the sentencer *must* consider the nature and circumstances of the offense, whether they have mitigating impact or not and whether the defense raises them or not.[4] We have further said that the

---

3. See, also, *Renfro v. Black* (1990), 52 Ohio St.3d 27, 32, 556 N.E.2d 150; *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233.

4. *State v. Fears* (1999), 86 Ohio St.3d 329, 345, 715 N.E.2d 136. See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 99, 512 N.E.2d 598; *State v. Davis* (1996), 76 Ohio St.3d 107, 120, 666 N.E.2d 1099; *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 355, 662 N.E.2d 311.

sentencer "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus. But, cf., *Wogenstahl*, 75 Ohio St.3d at 356, 662 N.E.2d 311 ("the nature and circumstances of the offense may only enter into the statutory weighing process on the side of *mitigation*" (emphasis sic)).

{¶ 128} Accordingly, guilt-phase evidence bearing on the nature and circumstances of the offense is not categorically inadmissible in the penalty phase simply because it is introduced by the prosecution rather than the defense. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75; *State v. Jones* (2001), 91 Ohio St.3d 335, 350, 744 N.E.2d 1163; *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 111.

{¶ 129} Moreover, "it must be kept in mind that the term 'abuse of discretion' means more than an error of law or error of judgment." *State ex rel. Wilms v. Blake* (1945), 144 Ohio St. 619, 624, 30 O.O. 220, 60 N.E.2d 308. In other words, a reviewing court may not override the trial court's determination that a particular item of evidence is relevant or irrelevant simply because it disagrees with the trial court. "The issue of whether testimony or evidence is relevant or irrelevant, confusing or misleading, is best decided by the trial judge, who is in a significantly better position to analyze the impact of the evidence on the jury." *Renfro v. Black* (1990), 52 Ohio St.3d 27, 31, 556 N.E.2d 150.

{¶ 130} "The term 'abuse of discretion' * * * implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 404 N.E.2d 144, citing *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855. "Abuse of discretion" means " 'a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence.' 1 Bouv.Law Dict., Rawle's Third Revision, p. 94. * * * The term has been defined as 'a view or action "that no conscientious judge, acting intelligently, could honestly have taken." ' " *Wilms*, 144 Ohio St. at 624, 30 O.O. 220, 60 N.E.2d 308, quoting *Long v. George* (1937), 296 Mass. 574, 579, 7 N.E.2d 149, quoting *Davis v. Boston Elevated Ry. Co.* (1920), 235 Mass. 482, 502, 126 N.E. 841. Accord *State ex rel. Shafer v. Ohio Turnpike Comm.* (1953), 159 Ohio St. 581, 591, 50 O.O 465, 113 N.E.2d 14.

{¶ 131} The trial judge's action in excluding the evidence in question here simply cannot be described in the above terms. The central task of the jury in the penalty phase of a capital case is to "determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case." R.C. 2929.03(D)(2). A trial judge cannot be said to have acted arbitrarily or unconscionably merely because he exercised caution to ensure that the jury focused its attention on that task.

Here, the trial court could reasonably have determined that these particular exhibits had an excessive tendency to focus the jury's attention on the aggravated murder itself and away from the aggravating circumstances and mitigating factors that the jury was required to balance.

{¶ 132} Our holding that the trial judge did not abuse his discretion should not be understood as an endorsement of his ruling. The exhibits were not intrinsically inadmissible, and the trial judge might reasonably have made a different ruling. But the question before us is whether, in excluding them, the trial judge acted arbitrarily, unreasonably, or unconscionably. On the record before us, we cannot conclude that he did.

{¶ 133} The jury's recommendation of death was tainted by its exposure, during penalty-phase deliberations, to evidence that the trial court had reasonably excluded from that phase. Therefore, that recommendation cannot serve as the basis for a death sentence in this case. It follows that the court of appeals erred in holding the declaration of a mistrial by the trial court to be an abuse of discretion. We therefore sustain Hancock's first proposition of law, vacate his death sentence, and remand for resentencing.

### III. Eligibility for Death Sentence on Remand

{¶ 134} Former R.C. 2929.06(B), as it was in effect when Hancock committed the murder on November 13, 2000, provided:

{¶ 135} "If the sentence of death that is imposed upon an offender is vacated upon appeal *because of error that occurred in the sentencing phase of the trial* and if division (A) of this section does not apply, the trial court that sentenced the offender shall conduct a new hearing to resentence the offender. If the offender was tried by a jury, the trial court shall impanel a new jury for the hearing. * * * At the hearing, the court shall follow the procedure set forth in division (D) of section 2929.03 of the Revised Code in determining whether to impose upon the offender a sentence of death, life imprisonment without parole, life imprisonment with parole eligibility after serving twenty-five full years of imprisonment, or life imprisonment with parole eligibility after serving thirty full years of imprisonment."[5] (Emphasis added.) 147 Ohio Laws, Part IV, 7438.

{¶ 136} We are vacating Hancock's death sentence "because of error that occurred in the sentencing phase of the trial": the erroneous introduction of excluded evidence into the jury's sentencing deliberations. R.C. 2929.06(B). Thus, R.C. 2929.06(B) requires that, upon remand, the trial court impanel a new

---

5. This former version of R.C. 2929.06(B) took effect on July 29, 1998. 147 Ohio Laws, Part IV, 7444. It was amended by Sub.H.B. No. 184, effective March 23, 2005. The 2005 amendments do not affect our disposition of this case.

jury, conduct a new hearing to resentence Hancock, and consider all possible sentences, including death, life imprisonment without parole, life imprisonment with parole eligibility after 25 full years of imprisonment, and life imprisonment with parole eligibility after 30 full years of imprisonment.

{¶ 137} However, in his fourth, fifth, sixth, and ninth propositions of law, Hancock raises issues that, if meritorious, would preclude imposition of a death sentence on remand. We now turn to those issues.

## A. Double Jeopardy on Resentencing

{¶ 138} In his fourth proposition of law, Hancock contends that, because the trial court initially imposed a life sentence on him, the Double Jeopardy Clause prohibits resentencing him to death on remand.

{¶ 139} "The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal." *Arizona v. Washington* (1978), 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717. On the other hand, the Double Jeopardy Clause ordinarily does *not* prohibit the imposition of an increased sentence on remand from appeal. See *United States v. DiFrancesco* (1980), 449 U.S. 117, 138–139, 101 S.Ct. 426, 66 L.Ed.2d 328.

{¶ 140} However, a line of precedent beginning with *Bullington v. Missouri* (1981), 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270, establishes that double-jeopardy principles may apply to bar a capital sentence on retrial. In *Bullington,* the capital-sentencing hearing at issue resembled a trial on guilt or innocence. The sentencer did not have "unbounded discretion," but instead "was presented both a choice between two alternatives and standards to guide the making of that choice." Id. at 438, 101 S.Ct. 1852, 68 L.Ed.2d 270. The prosecution "undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain" the death sentence. Id. Finally, Missouri state law *"explicitly require[d]* the jury to determine whether the prosecution ha[d] 'proved its case' " for imposing the death sentence. (Emphasis sic.) Id. at 444, 101 S.Ct. 1852, 68 L.Ed.2d 270.

{¶ 141} Thus, the jury's decision to impose a life sentence "meant that 'the jury has already acquitted the defendant of whatever was necessary to impose the death sentence.' " *Bullington,* 451 U.S. at 445, 101 S.Ct. 1852, 68 L.Ed.2d 270, quoting the dissent of Chief Justice Bardgett from the ruling of the Missouri Supreme Court majority below, *State ex rel. Westfall v. Mason* (Mo.1980), 594 S.W.2d 908, 922. For that reason, the life sentence deserved the same degree of finality that an acquittal of the offense itself would have been given. *Bullington,* 451 U.S. at 445–446, 101 S.Ct. 1852, 68 L.Ed.2d 270.

{¶ 142} Similarly, in *Arizona v. Rumsey* (1984), 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164, the trial court imposed a life sentence after finding that no

aggravating circumstances existed—a finding that precluded a death sentence under state law. Because the court's findings were "sufficient to establish legal entitlement to the life sentence," id. at 211, 104 S.Ct. 2305, 81 L.Ed.2d 164, they amounted to an "acquittal" of the death penalty and hence were final under the Double Jeopardy Clause. Id.

{¶ 143} However, "it is not the mere imposition of a life sentence that raises a double-jeopardy bar. * * * [A]n 'acquittal' at a trial-like sentencing phase, rather than the mere imposition of a life sentence, is required to give rise to double-jeopardy protections." *Sattazahn v. Pennsylvania* (2003), 537 U.S. 101, 107, 123 S.Ct. 732, 154 L.Ed.2d 588. In order to raise a double-jeopardy bar to resentencing, the imposition of a life sentence must be "an acquittal *on the merits*"—that is, it must be "based on findings sufficient to establish legal entitlement to the life sentence." (Emphasis added.) *Rumsey,* 467 U.S. at 211, 104 S.Ct. 2305, 81 L.Ed.2d 164. See, also, *Sattazahn,* 537 U.S. at 107–108, 123 S.Ct. 732, 154 L.Ed.2d 588 (discussing *Rumsey*). The relevant inquiry is whether the sentencer or reviewing court has found that the state has *failed to prove* the appropriateness of a death sentence. See *Poland v. Arizona* (1986), 476 U.S. 147, 154–156, 106 S.Ct. 1749, 90 L.Ed.2d 123; *Sattazahn,* 537 U.S. at 108, 123 S.Ct. 732, 154 L.Ed.2d 588.

{¶ 144} Thus, in *Sattazahn,* a jury deadlock as to the appropriateness of death as a penalty was not an acquittal on that issue, because the jury "made no findings with respect to the alleged aggravating circumstance." Id. at 109, 123 S.Ct. 732, 154 L.Ed.2d 588. Nor did the trial judge make any findings when he sentenced the defendant to life, because the relevant statute required him to impose a life sentence if there was a hung jury in the penalty phase. In that situation, " ' "[t]he judge makes no findings and resolves no factual matter. Since judgment is not based on findings which resolve some factual matter, it is not sufficient to establish legal entitlement to a life sentence." ' " 537 U.S. at 109–110, 123 S.Ct. 732, 154 L.Ed.2d 588, quoting the lower court (*Commonwealth v. Sattazahn* (2000), 563 Pa. 533, 548, 763 A.2d 359), quoting *Commonwealth v. Martorano* (1993), 535 Pa. 178, 194, 634 A.2d 1063.

{¶ 145} In this case, neither judge nor jury ever found that the prosecution had failed to prove its case that Hancock deserved the death penalty. *Poland,* 476 U.S. at 154, 106 S.Ct. 1749, 90 L.Ed.2d 123. "Plainly, the [jury] did not acquit, for [it] imposed the death penalty." Id. And the trial judge, when he imposed a life sentence in the first trial, made clear that he was not deciding whether the death penalty was appropriate in this case. He said:

{¶ 146} *"I have not undergone the weighing process in this case.* I do not know if the issue is even appealable, but I wanted to make it clear on the record that the court is concluding that the sentencing recommendation of the jury is

being ignored, *not necessarily on its merits. You may well deserve the death penalty. I haven't gotten to that.* But [the jury's recommendation is being ignored] because of the court's determination that the jury now discharged may have been prejudiced or unduly influenced by improperly considered evidence in the sentencing phase." (Emphasis added.)

{¶ 147} Thus, the trial judge's decision to give Hancock a life sentence was not based on any finding that the state had failed to prove its case. Instead, the judge declared a mistrial based on a procedural error. Hence, the imposition of a life sentence does not amount to an "acquittal" of the death penalty, as that term is used in *Bullington, Rumsey, Poland,* and *Sattazahn.*

{¶ 148} Hancock concedes that "*Sattazahn* might seem to defeat" his double-jeopardy claim. Nevertheless, he contends that the life sentence in this case amounted to an acquittal on the merits because the trial judge exercised discretion in declaring a mistrial. See, e.g., *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92 (granting of mistrial is discretionary act). Hancock quotes Justice O'Connor's statement in a concurring opinion in *Sattazahn* that "a life sentence imposed *by operation of law* after a capital sentencing jury deadlocks * * * is *not* an 'acquittal on the merits' barring retrial." (Emphasis added.) *Sattazahn,* 537 U.S. at 117, 123 S.Ct. 732, 154 L.Ed.2d 588 (O'Connor, J., concurring in part and concurring in judgment). From this, he infers—illogically—that a life sentence imposed by an act of judicial discretion, and not by operation of law, is necessarily an acquittal on the merits. He then concludes that, because the trial judge had discretion whether to declare a mistrial, the life sentence was not "imposed by operation of law."

{¶ 149} But the fact that the trial judge had discretion in deciding to declare a mistrial does not transform that decision into an acquittal *on the merits.* The trial judge imposed a life sentence here because procedural error had invalidated the jury's death verdict, and without a valid jury recommendation, he had no power to impose a death sentence. See *State v. Springer* (1992), 63 Ohio St.3d 167, 171–172, 586 N.E.2d 96.

{¶ 150} Only a finding that the state has failed to prove its case for death constitutes an "acquittal of the death penalty" for double-jeopardy purposes. See *Sattazahn,* 537 U.S. at 117, 123 S.Ct. 732, 154 L.Ed.2d 588 (O'Connor, J., concurring in part and concurring in judgment) (deadlocked jury did not acquit the defendant on the merits of the death penalty, because "[i]t did not make any findings about the existence of the aggravating or mitigating circumstances"). Neither the trial judge nor the jury made such a finding here. Hence, Hancock's double-jeopardy argument fails, and we overrule his fourth proposition of law.

{¶ 151} In Hancock's fifth proposition of law, he contends that jeopardy as to his sentencing terminated when the trial judge declared a mistrial, and therefore

the Double. Jeopardy Clause prohibited resentencing. It is true that, in certain circumstances, a defendant may not be retried after a mistrial. See, generally, *Oregon v. Kennedy* (1982), 456 U.S. 667, 673, 102 S.Ct. 2083, 72 L.Ed.2d 416. Hancock attempts to extend this principle to capital sentencing. However, he cites no authority for doing so except the dissenting opinion in *Sattazahn.*

{¶ 152} Our decision, however, is governed by the majority opinion in *Sattazahn,* which states: "Under the *Bullington* line of cases * * *, the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.'" 537 U.S. at 109, 123 S.Ct. 732, 154 L.Ed.2d 588. We have already concluded that there has been no "acquittal" of the death penalty in this case. That ends the analysis. Hancock's fifth proposition of law is overruled.

{¶ 153} In his sixth proposition, Hancock contends that we should read the double-jeopardy prohibition in Section 10, Article I of the Ohio Constitution more broadly than the United States Supreme Court has read the Double Jeopardy Clause of the Fifth Amendment, so as to prohibit resentencing in this case. However, Hancock offers no persuasive reasons why we should interpret the Ohio Constitution in such a fashion. We overrule his sixth proposition of law.

### B. Execution of "Severely Mentally Ill" Offenders

{¶ 154} In his ninth proposition, Hancock contends that to execute a convicted murderer who was "severely mentally ill" at the time of his offense is cruel and unusual punishment, prohibited by the Eighth Amendment.

{¶ 155} We have found no court that has held that it violates the Eighth Amendment to impose a death sentence on a defendant who was severely mentally ill at the time of the offense.[6] Moreover, Hancock cites no evidence that the execution of such offenders is inconsistent with "evolving standards of decency." *Trop v. Dulles* (1958), 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (plurality opinion). Connecticut is the only state we have found that bars outright the execution of offenders who, at the time of the offense, had a "significantly impaired * * * ability to conform [their] conduct to the requirements of law." Conn.Gen.Stat.Ann. 53a–46a(h). See *State v. Ross* (2004), 269 Conn. 213, 344, 849 A.2d 648.

{¶ 156} Hancock cites *Atkins v. Virginia* (2002), 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, which holds that mentally retarded offenders may not be executed. The justifications for the death penalty—retribution and deterrence—are inapplicable to mentally retarded offenders in general. Id. at 318–320, 122 S.Ct. 2242, 153 L.Ed.2d 335. Hancock argues that the same is true of seriously

---

6. The Eighth Amendment does prohibit the execution of those who, *at the time of execution,* are insane. *Ford v. Wainwright* (1986), 477 U.S. 399, 409–410, 106 S.Ct. 2595, 91 L.Ed.2d 335.

mentally ill persons. He contends that such individuals resemble retarded persons in that they "lack or have acutely limited capacities for reasoning, judgment, and impulse control."

{¶ 157} However, this claim appears to rest on nothing but Hancock's assertion that it is so. He does not attempt to lay a basis for his broad statement that everyone with a severe mental illness is comparable to a mentally retarded person with respect to reasoning, judgment, and impulse control. He does not even explain what he means by "severe mental illness." Cf. *Atkins,* 536 U.S. at 309, 122 S.Ct. 2242, 153 L.Ed.2d 335, fn. 3 (defining "mental retardation"); *State v. Lott,* 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, ¶ 12 (clinical definitions of mental retardation provide standards for evaluating claim). Mental illnesses come in many forms; different illnesses may affect a defendant's moral responsibility or deterrability in different ways and to different degrees.

{¶ 158} R.C. 2929.04(B)(3) and (B)(7) permit the judge and jury in a capital case to consider a defendant's mental illness as a mitigating factor, thus providing the individualized determination that the Eighth Amendment requires in capital cases. Hancock asks us to establish a new, ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case. To do as he suggests would be a significant extension of *Atkins.* Hancock has not made a persuasive argument that *Atkins* should be so extended. Accordingly, we overrule Hancock's ninth proposition of law.

## C. Other Sentencing Issues

{¶ 159} Our disposition of this case moots Hancock's second, 12th, and 19th propositions of law, which relate to the imposition of the death penalty. In his 21st proposition of law, Hancock attacks the constitutionality of Ohio's death penalty statutes. We summarily overrule this proposition.

{¶ 160} In his seventh proposition of law, Hancock contends that his death sentence is inappropriate and disproportionate. In view of our decision to remand this cause for resentencing, this proposition is also moot.

## IV. Conclusion

{¶ 161} We affirm Hancock's conviction for aggravated murder. Having sustained Hancock's first proposition of law, we vacate the death sentence entered by the trial court on October 22, 2003. Pursuant to former R.C. 2929.06(B), we remand this cause to the trial court for further proceedings consistent with this opinion.

Judgment accordingly.

PFEIFER, O'CONNOR and LANZINGER, JJ., concur.

RESNICK, LUNDBERG STRATTON and O'DONNELL, JJ., concur in part and dissent in part.

---

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

{¶ 162} I concur in the majority opinion to the extent that it affirms Hancock's conviction for aggravated murder. However, unlike the majority, I would overrule all of Hancock's propositions of law. Like the court of appeals, I would hold that the trial court abused its discretion by excluding the exhibits at issue, that Hancock was therefore not harmed by their inadvertent submission to the jury, and that no proper basis for a mistrial existed. Accordingly, I respectfully dissent from the reversal of the death sentence.

{¶ 163} The guilt-phase exhibits in question are the strips of bedsheet used to tie Wagner down and strangle him; the crime-scene photographs, State's Exhibits 3 through 12, which document the painstaking and elaborate fashion in which Hancock tied Wagner to the bunk, rendering him helpless; and Wagner's recorded confessions to Highway Patrol officers investigating the murder.

{¶ 164} These exhibits unquestionably bear upon the nature and circumstances of the offense. They document Hancock's planning and commission of the aggravated murder. The photographs show how Hancock ran strips of bedsheet under the mattress, wove them through holes in the metal platform on which the mattress rested, then tied the ends around Wagner's wrists and ankles. They also show the knots in the ligature, and they give the viewer an idea of how tightly Hancock drew the ligature around Wagner's throat. State's Exhibits 13 and 15 were the very strips of cloth used to bind and strangle Wagner.

{¶ 165} In his confessions, Hancock freely recounted the thought process he had engaged in before killing Wagner, including his reasons for doing so and the lengthy deliberation, planning, and deceit that went into the murder. Hancock also told how long it took him to kill Wagner and what he was thinking as he did it.

{¶ 166} In support of the trial court's decision to exclude these exhibits, Hancock argues that the state may reintroduce guilt-phase evidence in the penalty phase *only* if the evidence either rebuts the defendant's mitigation evidence or is relevant to the aggravating circumstances, as opposed to the offense itself. He asserts that the exhibits in question were irrelevant and inadmissible in the penalty phase because they neither rebutted his mitigation nor went to the nature and circumstances of the aggravating circumstances.

{¶ 167} To begin with, as the court of appeals pointed out in the original appeal, the exhibits in question were relevant to rebut the mitigating factors of

"duress, coercion, or strong provocation" contained in R.C. 2929.04(B)(2). *State v. Hancock*, Warren App. Nos. CA2001–12–115, CA2001–12–116, and CA2002–01–004, 2003-Ohio-1616, 2003 WL 1689612, at ¶ 30. Hancock argued at trial that Wagner provoked him into murder by making a sexual advance and by bragging about having molested a child. Because the exhibits illustrate the calculated deliberation with which Hancock acted, they rebut—or at least reduce the mitigating weight of—his provocation claim. Thus, Hancock's argument fails even on its own terms.

{¶ 168} But more than this, we have never interpreted R.C. 2929.03(D)(1) in the way Hancock suggests—as though it excluded guilt-phase evidence bearing "only" on the nature and circumstances of the offense. In fact, we have expressly rejected that interpretation. It is true that we have said that "the nature and circumstances of the offense may only enter into the statutory weighing process on the side of *mitigation*." (Emphasis sic.) *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 356, 662 N.E.2d 311. But it does not follow that evidence regarding the nature and circumstances of the offense must be excluded from the penalty phase if it lacks mitigating value.

{¶ 169} To the contrary, "R.C. 2929.04(B) *requires* the jury, trial court, or three-judge panel to '*consider*, and weigh against the aggravating circumstances proved beyond a reasonable doubt, *the nature and circumstances of the offense* * * *.' (Emphasis added.) In a particular case, the nature and circumstances of the offense may have a mitigating impact, or they may not. * * * Either way, they must be considered." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 99, 512 N.E.2d 598. See, also, *Wogenstahl*, 75 Ohio St.3d at 355, 662 N.E.2d 311; *State v. Davis* (1996), 76 Ohio St.3d 107, 120, 666 N.E.2d 1099.

{¶ 170} Moreover, although the nature and circumstances of the offense may not be used as aggravating circumstances, we have held that they may be cited "as reasons supporting [a] finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 171} For these reasons, we have expressly stated that the state *may* reintroduce guilt-phase evidence that bears on the nature and circumstances of the offense. "[B]ecause the trial court must consider the nature and circumstances of the offense, R.C. 2929.03(D)(1) 'permit[s] repetition of much or all that occurred during the guilt stage.'" *State v. Fears* (1999), 86 Ohio St.3d 329, 345–346, 715 N.E.2d 136, quoting *State v. DePew* (1988), 38 Ohio St.3d 275, 282–283, 528 N.E.2d 542.

{¶ 172} Not only that, we have held guilt-phase evidence admissible in the penalty phase *precisely because* it bore on the nature and circumstances of the offense. For example, we said in *State v. Jones* (2001), 91 Ohio St.3d 335, 744

N.E.2d 1163, that "[m]uch of the trial phase evidence was relevant at the sentencing phase because it was related to the aggravating circumstances, *the nature and circumstances of the offense,* and the asserted mitigating factors." (Emphasis added.) Id. at 350, 744 N.E.2d 1163. Accord *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75; *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 111.

{¶ 173} Doubtless, a trial court should exclude guilt-phase evidence from the penalty phase if that evidence *truly* is irrelevant to sentencing. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 485, 721 N.E.2d 995. But the fact that guilt-phase evidence goes to the nature and circumstance of the offense is grounds for *admission,* not exclusion. As we said in *State v. Hill* (1996), 75 Ohio St.3d 195, 201, 661 N.E.2d 1068, "a capital defendant in Ohio is not statutorily or constitutionally entitled to protection during the sentencing process from the facts he himself created in committing his crime."

{¶ 174} Because I would affirm the imposition of the death sentence recommended by the jury, I dissent in part.

LUNDBERG STRATTON and O'DONNELL, JJ., concur in the foregoing opinion.

————

David H. Bodiker, Ohio Public Defender, Joseph E. Wilhelm, Chief Counsel, Death Penalty Division, and Kelly L. Culshaw, Supervisor, Death Penalty Division, for appellant.

Rachel Hutzel, Warren County Prosecuting Attorney, and Andrew L. Sievers and Mary K. Hand, Assistant Prosecuting Attorneys, for appellee.