The STATE of Ohio, Appellee,

v.

DAVIS, Appellant.

[Cite as *State v. Davis*, 193 Ohio App.3d 130, 2011-Ohio-1280.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 23858.

Decided March 18, 2011.

R. Lynn Nothstine, Assistant Prosecuting Attorney, for appellee.

Brandin D. Marlow, for appellant.

FROELICH, Judge.

{¶ 1} Defendant-appellant, Tracy Davis, appeals from his conviction and sentence for intimidation of a witness and tampering with evidence. For the following reasons, the judgment of the trial court is affirmed in part and reversed in part.

I

{¶ 2} Late on the morning of November 25, 2007, Montgomery County sheriff's deputy Haas was on routine patrol when he paused to allow a black Chevy Astro van to back out of a parking lot in front of him. The driver, who was later identified as Davis, watched the deputy avidly as he maneuvered his van, nearly turning around in his seat, which struck the deputy as odd. The deputy's interest was further piqued when Davis waited through a red light before turning right, though he could have legally turned on red.

{¶ 3} The deputy decided to run the license plate, but before he was able to do so, Davis began to speed up before suddenly turning into the parking lot of another apartment building. Davis jumped out of the van and started running away. Deputy Haas parked his cruiser and ran after Davis, who ignored the deputy's commands to stop. Deputy Haas chased Davis around the apartment complex, back to the parked van. Davis got into the driver's seat and started the van. Deputy Haas drew his weapon, pointed it at Davis, and ordered him to get out of the van. Ignoring the officer, Davis first quickly reversed the van, then stopped it and accelerated directly toward Deputy Haas. As Deputy Haas moved to the side, he fired several rounds. Davis left the scene.

{¶ 4} Deputy Haas radioed in to dispatch to advise of the direction in which he had seen Davis fleeing. While other officers attempted to locate and pursue Davis, Deputy Haas remained in the parking lot to preserve the crime scene. Deputy Haas felt pain in his knee and believed that the van might have hit him.

{¶ 5} Several minutes later, another deputy found the van parked at a nearby apartment complex. She saw two males collecting broken glass from the windshield of the van. Backup arrived, and as the deputies approached the van, the men disappeared between two buildings. The deputies noticed that the van had bullet holes in it, and there were pieces of duct tape on the van, which were found to be covering more bullet holes.

{¶ 6} The van was registered to Davis's ex-wife, Sinnie Nelson. The deputies learned that the address on the registration was incorrect. When they asked a maintenance man at the complex where the van was found who owned the van, he pointed out Nelson's apartment to the officers. When deputies spoke with Nelson, she told them that a person named Patrick had been driving the van.

{¶ 7} Davis was later arrested on an unrelated matter and taken to the district headquarters. Deputy Haas was writing up his report from the morning incident and saw Davis as he was brought in. Deputy Haas recognized Davis as the man who had been driving the black Astro van that morning.

{¶ 8} Later that day, when deputies returned and collected bloody towels and clothing from Nelson's home, they told her that Davis was in jail. Feeling safe because Davis was in jail, Nelson changed her story and admitted to the deputies that she had allowed Davis to drive her van that morning in order to drive his friend Patrick to the store. When Davis returned, he had blood on his shirt. Nelson told the deputies that she asked Davis what had happened, but he told her that it was none of her business. He appeared to be very nervous; he kept looking out the window as he cleaned himself up and changed his clothes. Nelson told the deputies that she had lied to them at first because Davis told her that if the police came to talk to her, she should tell them that Patrick was driving the

van, and Davis threatened to kill Nelson and blow up her apartment if she refused.

{¶ 9} Davis was indicted on one count each of felonious assault and intimidating a witness and two counts of tampering with evidence (one count for taping over the bullet holes and one count for changing his clothes and washing away blood). Davis filed a motion to suppress, which was granted in part, and the case proceeded to trial.

{¶ 10} Davis testified in his own defense. He insisted that Deputy Haas was in front of him, rather than behind. As Davis parked, Deputy Haas made a U-turn. Patrick got out and ran away from the van, and the deputy followed him. Davis went to the apartments of some acquaintances, but neither answered their door. Not seeing the cruiser, Davis returned to his van. As he started to back out, Deputy Haas came running up, yelling and shooting at Davis, who accelerated and tried to get away from the deputy. Davis denied ever driving toward Deputy Haas or trying to hit him.

{¶ 11} Davis claimed that he had returned to Nelson's apartment and tried to clean up the broken glass with the help of a neighbor. Davis admitted that he had used duct tape to keep the windshield from cracking further and to cover the other holes because he did not want anyone, including the police, to ask questions. Davis testified that he told Nelson that the police had tried to kill him, and he admitted that he told Nelson to tell the police that Patrick was driving the van. However, he denied threatening Nelson. Davis cleaned up, changed his clothes, and went to work.

{¶ 12} A jury found Davis guilty of intimidating a witness and one count of tampering with evidence (taping over the bullet holes). Davis was acquitted of the second tampering count (changing his clothes and washing away blood). The jury could not reach a verdict on the felonious-assault charge, and the court declared a mistrial on that charge, which is not at issue in this appeal. Davis was ordered to serve concurrent sentences of four years for intimidating a witness and three years for tampering with evidence. Davis appeals.

## II

{¶ 13} Davis's first assignment of error:

{¶ 14} "Davis' conviction for intimidation of a witness is unsupported by sufficient evidence and is against the manifest weight of the evidence." ·

{¶ 15} Davis's second assignment of error:

{¶ 16} "Davis' conviction for tampering with evidence is against the manifest weight of the evidence."

{¶ 17} In his first assignment of error, Davis maintains that his conviction of intimidation of a witness was not supported by sufficient evidence and that it was against the manifest weight of the evidence. In his second assignment of error, he argues that his conviction of tampering with evidence was against the manifest weight of the evidence.

{¶ 18} A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins* (1999), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." In contrast, when reviewing a judgment under a manifest-weight standard of review " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 19} Davis was convicted of intimidation of a witness in violation of R.C. 2921.04(B), which states: "No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a *criminal action or proceeding* in the discharge of the duties of the attorney or witness." (Emphasis added.)

{¶ 20} Directing our attention to *State v. Malone,* 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, Davis argues that because no "criminal action or proceeding" had been initiated when he threatened Nelson, he could not be convicted of intimidation of a witness. In response, the state insists that although no formal charges had been filed, there was an active, ongoing criminal investigation, which constitutes a "criminal action" and is sufficient to support a conviction for intimidation of a witness under R.C. 2921.04(B).

{¶ 21} The facts, as found by the jury, are not materially in dispute. The narrow legal question is whether threats made after the reporting of a crime and during its investigation constitute a violation of R.C. 2921.04(B). This, in turn,

requires us to answer whether the reporting and investigation of a crime is "a criminal action or proceeding" so as to be a violation of R.C. 2921.04(B).

{¶ 22} In *Malone,* the defendant threatened a witness to a rape immediately after he committed the offense, but two days before anyone reported the offense to the police. The Supreme Court stated in the first paragraph of its decision that the only issue addressed was "whether R.C. 2921.04(B) * * * applies to threats made before any * * * investigation or legal proceeding has commenced in a case." 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, at ¶ 1. The next sentence holds that "R.C. 2921.04(B) does not apply in such situations." Likewise, in its final paragraph, *Malone* holds that when "no investigation or prosecution has been initiated, a witness is not 'involved in a criminal action or proceeding' for purposes of R.C. 2921.04(B)." Id. at ¶ 30. The state's reading of these quotes is that if an investigation has been initiated, a witness (i.e., one who could supply evidence) is involved in "a criminal action or proceeding."

{¶ 23} The Supreme Court decision reviewed and affirmed *State v. Malone,* Marion App. No. 9–06–43, 2007-Ohio-5484, 2007 WL 2983155, which found insufficient evidence of a violation of R.C. 2921.04(B) when the threats took place prior to the report of the crime or any investigation or prosecution of a criminal case. The Supreme Court certified that this holding was in conflict with *State v. Gooden,* Cuyahoga App. No. 82621, 2004-Ohio-2699, 2004 WL 1172074, and *State v. Hummell* (June 1, 1998), Morrow App. No. CA–851, 1998 WL 355511.

{¶ 24} In *Gooden,* the defendant threatened a witness to a homicide in which the defendant's cousin was a suspect. The witness later gave a statement and became a witness for the prosecution in the homicide investigation. *Gooden,* at ¶ 8–9. The appellate court upheld the conviction, holding that "it is not necessary for a criminal proceeding to be pending in order to sustain a conviction for intimidation under R.C. 2921.04." Id. at ¶ 37.

{¶ 25} The Supreme Court also found *Malone* to be in conflict with *Hummell.* In that case, as with *Malone,* the defendant threatened witnesses to a rape immediately after the offense, but weeks before any report to the police. The *Hummell* court had affirmed the conviction because the defendant "was attempting to prevent the girls from discharging their duties as a witness to a criminal act." Id. at ¶ 3.

{¶ 26} Thus, the Supreme Court in *Malone* affirmed an acquittal under R.C. 2921.04(B) when the intimidation took place before any police report or investigation of a criminal case (*Malone*); it implicitly reversed convictions where the intimidation was before any report of the offense (*Hummell*) and where the intimidation was after the report of the crime and its initial investigation (*Gooden*).

{¶ 27} In its analysis, the Supreme Court in *Malone* states that while R.C. 2921.04 does not define "criminal action or proceeding," that phrase "commonly indicates the involvement of a court and implies a formal process involving a court." 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, at ¶ 15 and 18. The court distinguished victim intimidation, in which R.C. 2921.04 "applies immediately upon the commission of the underlying crime, prior to the involvement of legal authorities." Id. at ¶ 19. Rather, witness intimidation "does not apply to witnesses * * * who *might* become involved in a criminal action or proceeding. It applies to witnesses who *are involved* in a criminal action or proceeding." (Emphasis sic.) Id. at ¶ 25.

{¶ 28} The state makes a strong argument that *Malone*'s use of the word investigation in its first and last paragraphs implies that an investigation of a reported crime is a "criminal action or proceeding" so as to be within the prohibition of R.C. 2921.04(B). However, in *Gooden* (in which the Supreme Court found insufficient evidence of witness intimidation) there had been a crime and an investigation. Further, the *Malone* court states the question before it to be whether an R.C. 2921.04 conviction is "sustainable where the intimidation occurred after the criminal act but prior to any police investigation of the criminal act, and thus, also prior to any proceeding flowing from the criminal act in a court of justice." Id. at ¶ 9. Its answer is that such a conviction "is not sustainable when the intimidation occurred after the criminal act but prior to any proceedings flowing from the criminal act *in a court of justice.*" (Emphasis added). Id.

█ {¶ 29} We agree with the Supreme Court that witness intimidation, "whether immediately after the commission of a criminal act or after the charges have been filed, should not be countenanced and does real harm to the administration of justice." *Malone,* 121 Ohio St.3d 244, 2009-Ohio-310, 903 N.E.2d 614, at ¶ 27. However, our reading of *Malone* requires a holding that "criminal action or proceeding" as used in R.C. 2921.04 requires *"proceedings flowing from the criminal act in a court of justice."* (Emphasis added.) Id. at ¶ 9. Thus, since there had only been an offense reported and a police investigation initiated, there was insufficient evidence of a criminal action or proceeding to sustain a conviction for witness intimidation in violation of R.C. 2921.04(B).

{¶ 30} The issue raised by *Malone* would greatly benefit from an appeal and clarification by the Supreme Court.

█ {¶ 31} To the extent that Davis argues that the intimidation conviction was against the manifest weight of the evidence, he insists that Nelsons testimony was not credible both because she initially lied to the police and because she visited Davis in jail despite claiming to fear him. The credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to

resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. The jury heard the testimony of all of the witnesses and saw their demeanor on the stand. Because the jury "is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *State v. Spears*, 178 Ohio App.3d 580, 2008-Ohio-5181, 899 N.E.2d 188, ¶ 12, quoting *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." *State v. Pounds*, Montgomery App. No. 21257, 2006-Ohio-3040, 2006 WL 1661632, ¶ 39, citing *State v. Bradley* (Oct. 24, 1997), Champaign App. No. 97–CA–03, 1997 WL 691510.

{¶ 32} Nelson explained that she initially lied to the police about who had been driving her van because she was afraid of Davis. Once she knew that Davis had been arrested, she felt safe and told the police the truth of who had been driving her van; Nelson explained that while he was incarcerated, she had no reason to fear him. She visited him in jail because their daughter wanted to see her father. However, after Davis threatened Nelson during a visit at the jail, she stopped visiting him. The jury was in the best position to evaluate the credibility of Nelson's testimony. The jury's verdict indicates that it found Nelson to be a credible witness.

{¶ 33} Davis was also convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which states: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation."[1]

{¶ 34} Davis does not dispute that he knew that an investigation was occurring or that he used duct tape to cover bullet holes in Nelson's van. Rather, Davis insists that the state failed to prove that he used duct tape to cover the holes for the purpose of impairing the van's value or availability as evidence. However, both Davis's actions and his testimony belie this claim.

{¶ 35} While still bleeding from an injury caused by flying glass in the incident with the deputy, Davis took the time to clean up the broken glass in the van and to tape over the bullet holes. Davis admitted that he knew that the police would be looking for him. He also admitted that he put the tape on the van and that he

---

1. The definition of tampering with evidence specifically refers to an "investigation," whereas the definition of intimidation refers to "a criminal action or proceeding." R.C. 2921.12 and 2921.04.

did so primarily because he did not want people—including the police—to see the holes and ask questions about them. On cross-examination, the following testimony took place:

{¶ 36} "Q    But you wanted to make sure [the police] didn't see the bullet holes in the van, correct?

{¶ 37} "A    Not necessarily the police, that was everybody.

{¶ 38} "Q    Okay. Is the police included in the everybody?

{¶ 39} "A    I mean, yeah.   Just I didn't want nobody seeing it.

{¶ 40} "Q    Okay. Including the police?

{¶ 41} "A    Yeah, yes.

{¶ 42} "Q    What do you think would happen if the police saw that van there? Do you think they'd come looking for you?

{¶ 43} "A    They probably would."

{¶ 44} Davis's testimony, in addition to his actions, indicate an intent to conceal the bullet holes in the van, hoping that the police would not find either the van or him.

{¶ 45} Viewing the evidence, as we must, in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime of intimidation of a witness proven beyond a reasonable doubt. Furthermore, the jury's verdict reflects that it found the testimony of the state's witnesses to be more credible than that of Davis. A jury does not lose its way simply because it chooses to believe the state's witness over the defendant. *Pounds,* 2006-Ohio-3040, 2006 WL 1661632, at ¶ 40. Based on the record before us, Davis's convictions of intimidation of a witness and tampering with evidence are not against the manifest weight of the evidence. Although we have found insufficient evidence of intimidation and need not address manifest weight, we do so in case the sufficiency holding is reversed.

{¶ 46} Davis's first assignment of error is sustained, and his conviction of intimidating a witness is vacated. His second assignment of error is overruled, and his conviction of tampering with evidence is affirmed.

### III

{¶ 47} The judgment is reversed in part and affirmed in part.

Judgment affirmed in part
and reversed in part.

GRADY, P.J., and DONOVAN, J., concur.