[Cite as *State v. Schillo*, 2014-Ohio-2262.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100080**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## GREGORY SCHILLO

DEFENDANT-APPELLANT

### JUDGMENT:
REVERSED, CONVICTION VACATED,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. 12-CR-568852

**BEFORE:** Blackmon, J., Boyle, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** May 29, 2014

**ATTORNEYS FOR APPELLANT**

Ian N. Friedman
Kristina W. Supler
McCarthy, Lebit, Crystal, Liffman, L.L.C.
101 Prospect Avenue, W.
Suite 1800
Cleveland, Ohio 44115

Ronald L. Frey
Eric C. Nemecek
Friedman & Frey, L.L.C.
1304 West 6th Street
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By: Andrew Rogalski
Joseph J. Ricotta
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

**{¶1}** Appellant Gregory Schillo appeals his convictions and sentence following a bench trial. Schillo assigns the following errors for our review:

I. The trial court violated Mr. Schillo's constitutional rights by admitting a prejudicial anonymous letter at trial.

II. The state of Ohio failed to introduce sufficient evidence to sustain the conviction in this case.

III. Mr. Schillo's convictions are against the manifest weight of the evidence.

IV. The trial court erred and imposed a sentence contrary to law by failing to consider all statutory sentencing factors.

**{¶2}** After reviewing the record and pertinent law, we reverse Schillo's convictions, vacate his sentence, and remand for a new trial. The apposite facts follow.

**{¶3}** On November 20, 2012, the Cuyahoga County Grand Jury indicted Schillo on two counts of aggravated vehicular assault, third and fourth degree felonies respectively, and one count of driving under the influence, a first degree misdemeanor. On December 11, 2012, Schillo pleaded not guilty at his arraignment. On May 28, 2013, a bench trial commenced after Schillo executed a waiver of his right to a jury trial.

## Bench Trial

**{¶4}** Through the testimony of 15 witnesses, the evidence established that on November 9, 2012, at approximately 11:30 p.m., during a light drizzle, David Gamble was traveling eastbound on his bicycle across the Lorain-Carnegie Bridge. At the time, Gamble was headed to work wearing black jeans, a jacket with red sleeves, and carrying a

black backpack with a diagonal reflector. Gamble's bicycle was only equipped with reflectors on the pedals, but had no night-light.  Schillo, along his wife, had been out to dinner with members of the Brecksville Pre-School Mother's Club and their husbands, and was traveling eastbound in his Jeep across the Lorain-Carnegie Bridge.

{¶5}  The Lorain-Carnegie Bridge has four lanes; two lanes going east and two lanes going west, and equipped with street lamps, as well as bridge-lamps.  Both Gamble and Schillo were properly traveling in the right curb lane that has chevron markings indicating its shared use by bicycle and motorized vehicles.  Shortly after Schillo had passed the crest of the bridge, his Jeep struck Gamble's bicycle.  Gamble flew through the air and landed on the ground unconscious. Three weeks later, Gamble awoke in the intensive care unit of  MetroHealth Hospital, a quadriplegic, paralyzed from his neck down.

{¶6}  At the scene of the collision, Schillo indicated that he did not see Gamble. He  initially denied he had been drinking, but then admitted that he had consumed one beer, six hours earlier.  When asked to perform a field sobriety test, Schillo refused, indicating that he wanted to speak with his lawyer, and was consequently arrested. During post-arrest proceedings, the police asked Schillo to submit to a breathalyzer, but Schillo again indicated that he wanted to speak with his attorney.  Schillo did not submit to the breathalyzer test.

{¶7}  Subsequent investigation revealed that approximately 14-16 members of the Brecksville Pre-School Mother's Club and their husbands had a 7:30 dinner reservation at

the Market Garden Brewery ("Market Garden") located in Ohio City. Around 6:30 that evening, the dinner guests, including Schillo and his wife, began filtering into the area. Schillo and his wife were among a number of guests who arrived early and went next door to the adjoining Great Lakes Brewing Company ("Great Lakes") to have drinks before dinner.

{¶8} At 7:30 p.m., the dinner guests sat down for their meals and drinks. After about three hours, a number of dinner guests returned to the Great Lakes for after-dinner drinks. Around 11:15 p.m., Schillo, his wife, and another couple departed Great Lakes, headed for their respective homes. Subsequent investigations revealed that credit card receipts from Great Lakes and Market Garden indicated that Schillo purchased a total of nine high-alcohol-content beers that night.

{¶9} The victim, Gamble, testified that at the time of the collision, he was working as a security guard for Spread Networks, located in downtown Cleveland. Gamble testified that he rode his bicycle across the Lorain-Carnegie Bridge every night, Monday through Friday, headed to work. Gamble had chosen that route because the bridge was well lit and had traveled back and forth more than a thousand times without incident. He specifically rode in the middle of the lanes so that motorized vehicles would not attempt to pass him without moving to the left lane.

{¶10} Dan Bernier witnessed the collision. He was in the left lane, traveling eastbound across the Lorain-Carnegie Bridge, and Schillo's Jeep was about 50-75 feet ahead of him. Bernier testified that he noticed the bicyclist in the right lane ahead of the

Jeep.  Bernier began decelerating to allow space for Schillo to move into the left lane, but Schillo never switched lanes.   Instead, Schillo slammed directly into Gamble.

{¶11} Bernier stated that the bicyclist was clearly visible, despite it being night-time, and despite the light rain drizzle.   Bernier travels back and forth across the Lorain-Carnegie Bridge numerous times each week and has never had a problem with visibility.   Bernier expressed surprise that Schillo did not see the bicyclist.

{¶12} Officer Charles Moten of the Cleveland Police Department's Accident Investigation Unit responded to the scene shortly after the collision.   Officer Moten testified that he arrived after Gamble had been transported to the hospital.   Officer Moten arrived on the scene after Schillo and his wife were placed in the back of the first responding patrol car.

{¶13} Officer Moten testified that he asked Schillo to exit the car and the two stood in front of his patrol car, so that all interactions could be recorded by the dash-camera.    He immediately noticed that Schillo's speech was slurred and that he had a heavy odor of alcohol.   Officer Moten stated that when he asked whether he had been drinking, Schillo said he had not been drinking, but then acknowledged that he drank one beer six hours earlier.    Officer Moten testified that because of Schillo's slurred speech, odor of alcohol, and severity of the accident, he asked Schillo to perform the Standard Field Sobriety Test.   Officer Moten stated Schillo refused to perform the requested test and was arrested.

{¶14} While at the scene, Officer Moten was summoned to another scene of

another accident, but before leaving, he noted that the bridge was well lit, with the exception of one non-working street light. Officer Moten also noted that the westbound curb lane was under construction. Several hours later, Officer Moten returned to the scene and took a video of the site including the bridge and its lighting.

{¶15} Officer Scott Huff relieved Officer Moten. Officer Huff testified that Schillo spoke in a slurred, faded, and methodical manner, which in his experience was indicative of intoxication.

{¶16} Officer Huff stated that Schillo was transported downtown to be booked, and Officer Huff asked Schillo to take a breathalyzer, but Schillo responded he wanted to speak with his attorney. When Officer Huff advised Schillo that his license would automatically be suspended for a year, Schillo again asked to speak with his attorney. Schillo never took the breathalyzer.

{¶17} The state presented the testimony of five member of the Brecksville Pre-School Mother's Club; they were in attendance at Great Lakes and Market Garden. Some of the guests testified that they only went to the Market Garden for dinner, while others testified that they also went to Great Lakes, either before dinner or after dinner, or both. All testified that they had consumed varying amounts of alcoholic beverages throughout the evening. All guests largely testified that based on where they had been seated at dinner, or where they were located in the two-tier Great Lakes, they only observed Schillo drink one or two beers. None of these guests testified that Schillo appeared intoxicated that evening.

{¶18} Heather Toth ("Heather"), [1] one of the members of the Brecksville Pre-School Mother's Club, and a friend of Schillo since high school and college, testified for the state. She stated that she and her husband left Great Lakes with Schillo and his wife. Heather was the designated driver for her husband that night, and she walked with Schillo to the parking lot located a couple blocks away, retrieved their respective vehicles, and returned and collected their spouses.

{¶19} Both couples drove away from Great Lakes; they were approaching the Lorain-Carnegie Bridge, both cars came to a stop light; Heather in the right lane and Schillo in the left. Heather testified that when the light turned green, Schillo sped off; he was within two car lengths, and she observed him switch to the right lane and then back to the left. Heather testified that Schillo passed two cars, then switched back into the right lane, prompting her to think to herself that "Greg is driving pretty ballsy considering — considering he's been drinking." She saw him again upon reaching the crest of the bridge where the accident occurred. She apparently did not see the collision.

{¶20} Heather stated that as she began placing a 911 call, Schillo approached and asked "Heather, do you have anything for me?" Heather was unsure what he meant. Schillo asked a second time, and Heather indicated she had chewing gum, she asked if he wanted it, and he accepted. When asked why she offered Schillo chewing gum, Heather said that she gave him the chewing gum because he had a beer before they left the bar.

---

[1]Heather's husband, Eric Toth, testified for the defense, so these witnesses will be referred to by their first names.

{¶21} At the close of the state's case in chief, Schillo moved for acquittal, but the trial court denied the motion.

{¶22} Heather's husband, Eric Toth, testified on Schillo's behalf. He stated that he had known Schillo since they were six or seven years old; they went to high school together and have been friends throughout. He observed that Schillo drank two, no more than three, beers that night and that Schillo did not appear to be impaired or intoxicated.

{¶23} Schillo testified that he drank a total of three beers between the hours of 6 p.m. and 9 p.m., and that he was not impaired at the time of the collision. He stated that he had no advance notice that the bicycle was in his lane until it was too late. On cross-examination, when asked about the nine high-alcohol-content beers that appeared on his credit card receipts from Market Garden and Great Lakes, Schillo said that his wife drank the other six beers.

{¶24} Dale Meyer is a qualified expert in the field of accident reconstruction; he testified on Schillo's behalf. Meyer concluded that the collision was unavoidable and did not flow from reckless or impaired driving. Rather, Meyer attributed the collision to the poor lighting on the bridge and lack of reflective materials on the bicycle or on Gamble. Meyer stated that because the accident happened between the 11th and 13th street lamps, and the 12th street lamp was not working, there was darkness spanning some 400 hundred feet before there was light. Meyer thus concluded that by the time Schillo traveled through that span of darkness, the bicycle was literally in front of the Jeep.

**{¶25}** On June 3, 2013, the trial court found Schillo guilty of all three counts. On June 27, 2013, the trial court sentenced Schillo to a maximum of five years in prison, imposed a $5,000 fine, and a seven-year driver's license suspension. Schillo now appeals.

## Admission of Anonymous Letter

**{¶26}** In the first assigned error, Schillo argues the trial court erred by admitting an anonymous letter.

**{¶27}** The admission or exclusion of evidence is a matter left to the trial court's sound discretion; therefore, it will not be disturbed absent an abuse of discretion. *State v. Frazier*, 8th Dist. Cuyahoga No. 97178, 2012-Ohio-1198, ¶ 17. An abuse of discretion is a decision that is unreasonable, arbitrary, or unconscionable, rather than a mere error in judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶28}** Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence. Should hearsay statements be admitted improperly, however, such error does not necessarily require reversal of the outcome of the trial if it was harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 306-309, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

**{¶29}** Crim.R. 52(A) describes a harmless error as one that "does not affect substantial rights (and therefore) shall be disregarded." In order to find harmless error in a criminal matter, a reviewing court must find that the error was harmless beyond a

reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). When determining whether the admission of evidence is harmless, this court must find that "there is no reasonable probability that the evidence may have contributed to the defendant's conviction." *State v. Simmons*, 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789.

{¶30} In the instant case, Detective Richard Cerny, the lead investigator, was questioned on cross-examination as follows:

> Q.    Okay. You didn't begin any investigation until sometime in February 2013; is that a fair statement?
>
> A.    No. There was investigation going on.  I think I got an anonymous letter from the prosecutor's office in February.
>
> Q.    An anonymous letter?
>
> A.    Yes.
>
> Q.    First time I heard about that.   Where did that come from?
>
> A.    That's why it's called an anonymous letter perhaps.

Tr. 369.

> Q.    Did you make a report concerning receiving the anonymous letter?
>
> A.    I did.
>
> Q.    May I see?
>
> A.    Sure. You want to see my report or the anonymous letter.
>
> Q.    Well, just a second.

Tr. 371.

**{¶31}** Subsequent to the above exchange, in a sidebar discussion between the trial court and counsel, Schillo's defense counsel claimed the state had not provided information about the letter or a police report from Detective Cerny regarding the letter. The state indicated that the information about the letter was in the police report that had been provided in discovery. The state also indicated that they had no intentions of using the anonymous letter because it contained hearsay.

**{¶32}** On redirect examination, the state questioned Detective Cerny about the investigatory steps he took after receiving the anonymous letter. Detective Cerny indicated that he contacted the people listed in the letter and obtained their statements. Detective Cerny also indicated that he had included the existence of the anonymous letter in one of his police reports. The state proceeded to inquire about the content of the letter, and defense counsel objected, prompting the following sidebar discussion:

Mr. Gasper: The defense is objecting because of this being an anonymous letter. It mentions people, they have all testified before this court under oath. The subject matter of the anonymous note that the police acted on is of no concern. It actually violates my client's Sixth Amendment Right of confrontation. How do we cross examine an anonymous note since it's never been determined who wrote that note since the people who were at the party have all been gotten statements from, have been examined and cross examined before this court? I see no probative value of the contents of the anonymous letter.

The Court: Okay. State of Ohio?

Mr. Rogalski: Thank you, Your Honor. A couple things. Number one, the State of Ohio did not use this letter in its Direct Examination. It waited for the defense attorney to open the door. It was through responses from defense attorney's questions that we got to the topic of the anonymous letter. So I think the State

of Ohio is entitled for the detective to explain what it is and what he did with it since defense attorney opened the door.

Second of all, to the extent that it contains out-of-court declarations, the State of Ohio wouldn't be using it for the truth of the matter asserted but also for why the detective did what he did. This court can certainly — You know, in a jury trial you could give a limiting instruction that evidence can be used for one purpose but not for another. You can decide what the force of the evidence is and how you can consider it. But I think at this point in time it is relevant and admissible.

Mr. Gasper: Your Honor, first of all, we haven't reached the point of admissibility yet. The issue is whether or not this anonymous statement can be read into the record. This detective already said on the basis of this anonymous letter he contacted these people telephonically and got statements from them. So what other purpose is this anonymous letter for?

The Court: Well, I'm not going to discount the letter because I think, again, this was all brought up by your questioning. And he has a right to — because your main question was what was your investigation and how did you get where you got to, he can certainly testify that this letter is the way it is.

Mr. Gasper: And I don't think it's the content. In other words, this guy is drunk, whatever the words are, okay. There's no basis for us to confront that statement because it's in — What I'm saying is you don't have to have the contents of that for him to properly testify as a witness.

The Court: We don't have a jury, though, so it doesn't make a difference. I'll overrule your objection.

Tr. 397-400.

{¶33} Thereafter, the following exchange took place:

The Prosecutor: Detective Cerny, what was the content of that letter that caused you to contact all of those witnesses?

Det. Cerny:   In the body of the letter that was addressed to Mary C. Weston, the prosecutor that was formerly handling the case, it says, "As you suspect. . . Greg Schillo was extremely intoxicated the night of the incident.   He and his wife Erin went out to dinner with several other couples.   The night started out at Great Lakes Brewing Company, then dinner at Bier Market and then back to Great Lakes.   He drank the entire time often bragging how many Festivus he could drink.   I'm coming forward anonymously because he could have killed David.   David did not deserve this.   I do not wish for Greg to go to jail, but I do not think he should be able to walk away unscathed and blame things on the true victim.   Ms. Schillo is painting a sober picture of her husband which is really not the case."

And then the seven females on there with their phone numbers on the bottom.   It says, "I just need to have a clear conscience.   Thank you!"

Tr. 400-401.

{¶34} Schillo contends that admission of the letter was prejudicial and this mandates a new trial.   For reasons to be discussed in more detail below, we conclude that Schillo was prejudiced, because we cannot say beyond a reasonable doubt that the admission of the anonymous letter was harmless.

{¶35}   In reaching this conclusion, we are mindful of the testimony that weighs in favor of concluding that the admission of the letter was harmless error.   For example, after initially stating that he had not been drinking, then stating that he had one beer six hours earlier, Schillo ultimately admitted that he drank only three of the nine high-alcohol-content beers he and his wife purchased that evening.   Schillo also admitted that he lied because he was scared.   In addition, Schillo refused to perform the field

sobriety test and refused to take the breathalyzer, despite being advised that he faced an automatic license suspension.

{¶36} Both Officers Moten and Huff testified that Schillo was impaired at the time of the collision. Officer Moten, who has responded to more than 200 accidents, and interacted with approximately 600 to 700 people suspected of driving under the influence of alcohol, testified that Schillo was impaired. Notably, Officer Moten, trained in Alcohol Detention, Apprehension and Prosecution for OVI, testified that Schillo was impaired.

{¶37} Officer Huff, who interacted with Schillo both at the scene and at the booking station, testified that Schillo's speech was slurred, that he spoke in faded sentences, and had an odor of alcohol. Officer Huff concluded that Schillo was extremely impaired and unfit to drive.

{¶38} In addition, Heather testified that Schillo was driving ballsy, considering he's been drinking. Heather testified that she gave Schillo gum at the scene of the collision because he drank a beer before they left Great Lakes.

{¶39} Further, despite Meyer, Schillo's hired accident reconstruction expert's opinion, that the collision was unavoidable and not caused by being impaired, but by poor lighting on the bridge and by the lack of proper reflectors on Gamble's bicycle and clothing, Bernier's testimony suggests otherwise. Bernier, who Meyer never sought to contact during the investigation, watched as the collision unfolded. Given that Bernier could clearly see Gamble on the bicycle and that he had enough time to decelerate to

allow Schillo to change lanes, suggests that Schillo's reaction time was diminished if he failed to see Gamble until he struck the bicycle.

{¶40} The above examples when juxtaposed with the testimony of the five members of the Brecksville Pre-School Mother's Club, whose names were listed in the anonymous letter, weighs against finding that the letter was harmless. All five guests testified that they only observed Schillo drink one or two beers, and none testified that Schillo appeared intoxicated that evening. In addition, none of the employees of Great Lakes or Market Garden testified that Schillo was intoxicated. Thus, we cannot say beyond a reasonable doubt that the admission of the anonymous letter in this bench trial did not tip the proverbial scale in favor of guilt.

{¶41} Appellate courts presume that a trial court only considered relevant and admissible evidence in a bench trial. See *State v. Chandler*, 8th Dist. Cuyahoga No. 81817, 2003-Ohio-6037, ¶ 17, citing *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). When the trial court is the trier of fact, the judge is presumed capable of disregarding improper hearsay evidence, and unless it is demonstrated that the court relied on inadmissible hearsay, a conviction will not be reversed. *State v. Crawford*, 8th Dist. Cuyahoga No. 98605, 2013-Ohio-1659, citing *In re Sims*, 13 Ohio App.3d 37, 468 N.E.2d 111 (12th Dist.1983).

{¶42} However, with all due respect to the various trial judges who sit as the trier of fact in countless cases each year, the fact that a defendant forgoes a jury trial is hardly an excuse to give the state free rein to admit any and all evidence on the presumption that

the trial court will separate the wheat from the chaff. *State v. Hubbs*, 2d Dist. Montgomery No. 24969, 2012-Ohio-5313, citing *State v. Hamilton*, 77 Ohio App.3d 293, 300, 602 N.E.2d 278 (12th Dist.1991).

{¶43} Although an accused is not entitled to a perfect trial, he is entitled to a fair trial. *Id.*, citing *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *State v. Fawn*, 12 Ohio App.3d 25, 28, 114, 465 N.E.2d 896 (10th Dist.1983). By agreeing to have the trial courts sit as the trier of fact, the defendant does not waive his right to have only relevant evidence submitted to the trier of fact. *Id.*

{¶44} Although the state indicated that it had no intention of using the letter because it was hearsay, to prevent its action from being construed as gamesmanship, the state should have provided a copy of the letter to defense counsel in discovery instead of referencing the letter in a police report. At the same time, Detective Cerny confirmed that the existence of the letter was duly noted in the police report furnished to defense counsel in discovery. Thus, defense counsel was remiss for not inquiring about the content of the letter.

{¶45} We are mindful that the evidence of the contents of the anonymous letter was admitted in a bench trial, with no jury to be prejudiced by the evidence. And yet, the evidence is no less inadmissible, and the inference is no less forbidden.

{¶46} The trial court sets forth the following to support its verdict:

I based this finding on the following evidence produced at trial: Number one, that the defendant consumed alcohol throughout the evening of November 9th 2012; that the defendant was warned by at least eight pavement markings and three signs that a bicyclist could be in the right

lane; that the defendant failed to see Mr. Gamble on the bridge riding his bicycle; that the light on the bridge was sufficient for a non-impaired individual to see Mr. Gamble; that the misty drizzle rain should not have prevented the defendant from seeing Mr. Gamble, that the Defendant failed to see Mr. Gamble's reflectors included but not limited to the reflectors on his bike pedals, the reflectors on his book bag, and the red sleeves of his jacket; that the Defendant failed to brake prior to impact with Mr. Gamble; that the Defendant lied to the police officers numerous times regarding his consumption of alcohol.

Simply put, I find that the Defendant was not — I find the Defendant was impaired by the consumption of alcohol, and if he had not been impaired, then he would not have struck Mr. Gamble.

Tr. 775-776.

**{¶47}** In its statement announcing the verdict, quoted above, the trial court did not indicate that it found the letter relevant for some other purpose. Nor did it indicate that upon further consideration, the evidence was inadmissible, and would therefore not be considered by the trial court in arriving at its verdict. Statements to that effect would have been critical to include in its statement after previously indicating, at sidebar, that it would not discount the letter because it was brought about by defense counsel's questioning.

**{¶48}** Thus, notwithstanding the longstanding precedent that appellate courts presume that a trial court only considered relevant and admissible evidence in a bench trial, the risk exists that a reviewing court might ostensibly presume that the trial court considered the contents of the anonymous letter to have had some relevance; otherwise, it would not have admitted this evidence over objections.

**{¶49}** Consequently, because this was a case decided on conflicting evidence, in an abundance of caution, we are constrained to find that the error in its admission was not rendered harmless simply because Schillo was tried by the court and not a jury. Accordingly, we sustain the first assigned error, vacate Schillo's conviction, and remand for a new trial.

**{¶50}** Our disposition of the first assigned error renders the remaining errors moot. App.R. 12(A)(1)(c).

**{¶51}** Judgment reversed, conviction vacated, and case remanded for new trial.

It is ordered that appellant recover of appellee his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

PATRICIA ANN BLACKMON, JUDGE

MARY J. BOYLE, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR