[Cite as *State v. Rowe*, 2014-Ohio-3265.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                           :           C.A. CASE NO.    25993

v.                                               :           T.C. NO.    13CRB8333

JAMES E. ROWE, JR.                               :              (Criminal appeal from
                                                     Municipal Court)

    Defendant-Appellant                          :

                                                         :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the _____25th_____ day of _____July_____, 2014.

. . . . . . . . . .

AMY B. MUSTO, Atty. Reg. No. 0071514, Assistant City Prosecutor, 335 W. Third Street, Room 372, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

CARL BRYAN, Atty. Reg. No. 0086838, 266 Xenia Avenue, #225, Yellow Springs, Ohio 45387
    Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, P.J.

      **{¶ 1}**  James Edward Rowe, Jr., appeals from a judgment of the Dayton

Municipal Court which, following a bench trial, found him guilty of two counts of aggravated menacing, imposed a sentence of 180 days, suspended that sentence, placed him on community control for 18 months, and fined him $100 plus costs.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} The events giving rise to the charges against Rowe occurred on August 29, 2013, in front of his apartment building. It is undisputed that he intervened in an argument among some children from his neighborhood and that, in doing so, he yelled at and "cuss[ed] out" one of the children. Beyond these facts, Rowe, the children, and one other witness to the event recounted conflicting versions of the incident.

{¶ 4} The initial argument among the children involved two sisters, Savannah and Amariah, ages 13 and 7 respectively, and two brothers from another family, Alan and Austin, ages 10 and 8. The argument involved alleged threats against a neighborhood pet; the children argued about who among them had made the threats and who had reported the threats to the pet's owner, a woman who provided the children with sweets. All of the children testified at trial. The girls testified at trial that the boys were calling Amariah names and threatened to hit her; the boys admitted confronting the girls, but claimed that Savannah made threats against the boys. Rowe intervened, confronted and scolded Savannah, and told her that if she had a problem with the boys, she should take it up with their mother.

{¶ 5} The State presented the testimony of the two alleged victims, Savannah and Amariah. According to Savannah, Rowe was "in [her] face, yelling at [her]," which scared her. She told Rowe that he could not talk to her that way and threatened to get her mother

and uncle. Amariah testified that, as the girls started to walk home, Rowe went into his apartment and got a gun, which he pointed "upwards" out a window at her. Amariah yelled and the girls started to run. Savannah did not see the gun in the window, but she testified that she saw it when Rowe came outside with the gun, cocked it, and said "let them come" (referring to her threat to get her mother and uncle). Both of the girls described the gun as looking like a "police" gun, except that it was silver.[1]

{¶ 6} When Savannah was asked on cross-examination if it would "surprise" her if the officer she talked with that night said that she did not see a gun, Savannah responded, "No. I feel that that's what I saw." When asked if she could have forgotten to mention the gun, she stated, "No. I know I told him I seen a gun." Although Rowe emphasized at oral argument Savannah's statement that she only "felt" there had been a gun, her testimony, if believed by the court, was consistent that she had seen a gun.

{¶ 7} Both girls testified that they were scared by the encounter. Amariah stated that she had feared Rowe would hurt her; Savannah stated at trial that she had not thought that Rowe would shoot her, but that she ran away with her sister, who was crying.

{¶ 8} At the end of the State's case, which consisted only of the girls' testimonies, Rowe moved for a Crim.R. 29 dismissal. The trial court denied the motion.

{¶ 9} The defense called several additional witnesses. Austin and Alan testified that Rowe had been friendly with them, had helped fix their broken bikes, and had given them a lawnmower. Austin testified that Rowe had a red Xbox or Playstation

---

[1] It is unclear from the record whether the girls were comparing Rowe's gun to "police guns" generally or to the gun of the responding officer, specifically.

controller in his hand near the time of the altercation, and that Rowe did not have a gun in his house. Austin also testified that Rowe did not point a gun at the girls, and that he told the police this fact. Alan testified that Rowe did not seem mad at the girls, but he also stated that Rowe and Savannah had been yelling. Alan provided inconsistent testimony about whether he saw Rowe holding a game controller; at one point Alan said he did not see one, and at another point Alan stated that Rowe put the controller down in his house before the police arrived. Alan never saw a gun.

{¶ 10} Alan also testified that, on the morning of trial, he had a conversation with Rowe in the lobby of the courthouse. Alan denied that Rowe had told him what to say (the morning of trial) about what had happened on the night of the altercation, but Alan said Rowe "went over with me what happened." Alan recounted that Rowe said he had gone in the house to put the controller back before the police came, and then walked outside to wait for the police. During Alan's testimony, he (Alan) stated that his conversation that morning with Rowe was the first time he had heard about the game controller, and that he had not seen one the night of the altercation. Alan also testified that, while he and Rowe had been waiting for the police to arrive, Rowe had stated to Alan that he (Rowe) did not have a gun; Alan could not recall how that topic came up.

{¶ 11} The boys and Savannah testified that an acquaintance from the neighborhood, "Ms. Neesha" (Georneesha Allen) had been in the vicinity of Rowe's apartment at the time of the altercation. Allen was a friend of Rowe and testified for the defense. She stated that Rowe had stepped into the children's argument as an authority figure, but she admitted that the confrontation between Rowe and Savannah had "got heat,

got hectic." She never saw a gun, but she did see Rowe holding a red Playstation remote control; she believed it had come from his back pocket. Allen testified that Rowe never went inside and that he did not threaten the girls in any way. She also testified that she would not have tried to help Rowe (by testifying on his behalf) if she had seen him with a gun. Allen testified that she did not see the girls crying and that all of the children were "terrorists" who could use more discipline.

{¶ 12} Rowe testified that he was playing Playstation when the boys knocked on his door and asked him to fix a bike. Rowe walked outside with the boys and started talking with Allen; a short time later, he heard Savannah threatening the boys. He admitted that he cursed at Savannah and that it was inappropriate to do so, but "[his] temper got the best of [him]." He testified that, when Savannah threatened to get her mother and uncle, he (Rowe) raised his hands up, with a controller still in one hand, and said, "Go f***ing get them. I'll be f***ing here."[2] Rowe stated that he put the controller down inside the home after the girls left, and that he did not own a gun.

{¶ 13} Rowe testified that he asked the police to search his house to substantiate his claim that he did not have a gun, but they declined to do so. He also stated that he tried to tell the police about Allen's presence at the scene as they pulled away in the cruiser; Rowe stated that, in response, the police criticized him for not mentioning that fact sooner. Rowe acknowledged that he had not told the police, on the night of the incident, that he had had a

---

[2] Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

controller in his hand during the confrontation with the girls.

{¶ 14} Rowe admitted that he had talked to Alan and Austin in the lobby of the courthouse, but asserted that he was only trying to assure the boys that it was okay to tell the truth about not seeing the remote, if they did not see it.

{¶ 15} Dayton Police Officer Brandon Cartee was one of the officers who responded to the girls' mother's call to the police. The girls seemed scared and were crying when he arrived. He interviewed Amariah while another officer interviewed Savannah. Cartee testified, without objection, that Amariah stated that Rowe had pointed a gun at her through a screen door; he acknowledged that he might have confused a window and a door. Cartee corroborated Rowe's claim that Rowe had asked the police to search his house for a gun, but Cartee did not do so. Cartee spoke to the boys briefly at the scene, but stated that, other than the boys' friendship with Rowe, "they didn't have anything pertinent to add." Cartee did not recall Rowe's asserting that Allen had been present during the altercation. Cartee also did not recall Rowe's or the boys' mentioning a Playstation remote on the night of the incident.

{¶ 16} After Rowe presented his evidence, the State called the girls' mother in rebuttal. She testified to the girls' upset state when they came home, to their claim that Rowe had brandished a gun, and to the fact that both girls made such a statement to the police. The mother also testified that, when she confronted Rowe, he denied having a gun and yelled at her, calling her a "crackhead" and "the 'B' word."

{¶ 17} Rowe was found guilty on both charges of aggravated menacing, and he was sentenced as discussed above. As conditions of community control, the trial court required

Rowe to attend anger management classes and to have no contact with Savannah and Amariah.

{¶ 18} Rowe raises three assignments of error on appeal.

{¶ 19} The first assignment states:

**The weight of the State's evidence was insufficient for a conviction when weighed against the evidence for a dismissal.**

{¶ 20} Rowe seems to argue both that his convictions were supported by insufficient evidence and that they were against the manifest weight of the evidence.

{¶ 21} Sufficiency and manifest-weight challenges are separate and legally distinct determinations. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Rowe's first assignment mingles the two standards. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632 (2d Dist.), citing *State v. Adelman*, 9th Dist. Summit No. 18824, 1998 WL 852565, * 7 (Dec. 9, 1998).

{¶ 22} A sufficiency-of-the-evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *Thompkins* at 386. Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a

criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 23}** In contrast, when reviewing a judgment under a manifest-weight standard of review, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 24}** Rowe's argument emphasizes that the testimony of the children was inconsistent as to the presence of the gun, but that the only other adult witness, Allen, testified that she did not see Rowe with a gun. Rowe also argues that his testimony was not "seriously contradicted" except with respect to whether he had a gun and that, without compelling evidence that he possessed a gun, the State failed to offer any evidence that he had threatened the girls.

**{¶ 25}** R.C. 2903.21(A) defines aggravated menacing and states, in pertinent part, that no person shall knowingly cause another to believe that the offender will cause serious

physical harm to the person or property of the other person. Savannah's and Amariah's testimonies in this case that Rowe got in Savannah's face, yelled and cursed at her, and then was seen with a gun which he pointed toward the girls or over their heads constituted adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. Thus, Rowe's convictions were supported by sufficient evidence.

{¶ 26} The credibility of the witnesses, including child-witnesses, and the weight to be given to their testimony was for the trial court to determine.[3] *State v. Davis*, 193 Ohio App.3d 130, 2011-Ohio-1280, 951 N.E.2d 138, ¶ 31 (2d Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Conflicting evidence was presented about whether Rowe had a gun. The boys testified that Rowe held a controller in his hand, rather than a gun, but the testimony of the older boy, Alan, was inconsistent on this point; his testimony also hinted that Rowe may have tried to suggest a version of events to Alan, either the night of the incident or the morning of trial. Austin asserted that Rowe had held a controller outside of his house, but he also stated that he (Austin) had been in Rowe's house and Rowe did not possess a gun. The responding police officer testified that neither Rowe nor the boys had mentioned a controller the night of the incident, and that the boys had not offered any pertinent information.

{¶ 27} Further, Amariah testified that she had been afraid Rowe might hurt her when he pointed a gun at her, and the girls' mother testified that Savannah was crying and

---

[3] Rowe did not challenge in the trial court and does not challenge on appeal the trial court's determinations that Amariah, Austin, and Alan were competent to testify.

"scared to death for the same reasons." Officer Cartee stated that the girls were "still crying" and "seemed very upset" when he arrived on the scene. Although Savannah testified at trial that she did not think Rowe would shoot her, she also stated that she had been scared because she had never seen a gun pointed "towards" her. The court could have reasonably concluded that the girls believed Rowe would cause them serious harm.

{¶ 28} Finally, the boys and Allen were friends of Rowe and expressed a desire to help him. Although Allen was the only adult, other than Rowe, to witness the altercation, the court was not required to credit her testimony on that basis. Based on the evidence presented, the trial court did not clearly lose its way and create a manifest miscarriage of justice in finding Rowe guilty of both counts of aggravated menacing.

{¶ 29} The first assignment of error is overruled.

{¶ 30} The second assignment of error states:

**The court abused its discretion when it allowed an officer to testify as to the veracity of defense witnesses.**

{¶ 31} Rowe claims that Officer Cartee was permitted to comment in his testimony as to the perceived veracity of Alan and Austin.

{¶ 32} Preliminarily, we note that Cartee was called as a defense witness, and that defense counsel had not subpoenaed him, assuming that the State would do so. As such, Cartee appeared in court on very short notice, and his testimony reflected some inability to recall in detail the events surrounding his response to Rowe's apartment on August 29, 2013.

{¶ 33} On direct examination by the defense, Cartee stated that he was "sure" he

had talked with the boys, but did not remember what they had said; he acknowledged that he had not put the boys' names in his report. Cartee recalled statements from the boys and Rowe that the boys were "friends" with Rowe and that Rowe fixed their bikes from time to time. Cartee stated, "Other than that they [the boys] didn't have anything pertinent to add." He also stated that it would not surprise him if the boys stated that Rowe did not have a gun that day, but he did not specifically recall such a statement.

{¶ 34} On cross-examination by the prosecutor, Cartee stated that Rowe had not offered any explanation to him about why the girls might have thought he had pointed a gun at them, and he thought he "would have remembered" if Rowe had mentioned a Playstation remote in their conversation. It was "the kind of thing someone would probably tell you if you were accusing them of swinging a gun around." Cartee did not remember the boys' or Rowe's mentioning a Playstation remote when he interviewed them on the date of the incident. Cartee also stated that Rowe "seem[ed] to be good buddies with these young boys" (Alan and Austin), and he (Cartee) "discounted what they [the boys] had to say" about the incident on that basis.

{¶ 35} Rowe contends that the portion of Cartee's testimony wherein he asserted that the boys' statements or observations "were not reliable" because of their relationships with Rowe was improper testimony about the truthfulness of a witness in violation of *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989). Rowe did not object to Cartee's testimony on that basis, and thus he has waived all but plain error. *See, e.g., State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 74. "'Plain error exists only where it is clear that the verdict would have been otherwise but for the error.'" *Id.*,

quoting *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 52.

**{¶ 36}** The State asked Cartee on cross-examination if he had felt that the boys "were not reliable witnesses" because of their relationships with Rowe; he answered "I did." Cartee also testified that the boys' friendship with Rowe had factored into his assessment of the boys' perspectives and, on that basis, he had "discounted what they had to say." However, he further testified that, on the night of the incident, the boys had not reported anything helpful to his investigation. On redirect examination by the defense, Cartee was asked whether he would "just pass over evidence if [he] believed it wasn't credible?"; he responded "No."

**{¶ 37}** We find no plain error in the trial court's allowing Cartee to explain his actions, including his assessment of the helpfulness or relevance of the boys' observations. According to Cartee, at the time of his interactions with Alan and Austin, the boys had not said anything that incriminated or exculpated Rowe. Considering this fact, Cartee's conversation with the boys was of little significance to the ultimate issues in the case. Moreover, the trial court heard the boys' testimonies at trial, as well as Cartee's, and, as the trier of fact, it was in the best position to evaluate their credibility.

**{¶ 38}** The second assignment of error is overruled.

**{¶ 39}** The third assignment of error states:

**The State should not have been allowed to reopen its case in chief.**

**{¶ 40}** On rebuttal, the State called Savannah and Amariah's mother, who recounted the girls' claims and behavior on the night of the incident. Rowe claims that this was impermissible "re-opening" of the State's case; he also claims that he was prejudiced by

this because he could not "refresh [his] own case in chief," since the defense witnesses (presumably Alan and Austin) had returned to school by that time.

{¶ 41} The mother testified that, when the girls came home on the night of August 29, 2013, they were upset and crying and claimed that "there was a gun shown by Mr. Rowe." The mother immediately headed to Rowe's apartment and confronted him, and they had a heated exchange. The mother "wanted to ask him what had happened but [she] never really got to because he was just yelling at [her]" and very defensive. The mother recounted at trial what the girls had told police officers on the night of the incident, which corroborated the girls' testimonies at trial.

{¶ 42} Rowe did object to the mother's testimony on the basis that the State was trying to reopen its case, but the court overruled that objection. Rowe did not assert that his witnesses were no longer available, and there is no evidence in the record to support any such assertion. Furthermore, it is unclear whether or how the boys could have refuted the mother's testimony about what the girls told her or about her own confrontation with Rowe.

{¶ 43} Rowe also objected on hearsay grounds to the mother's testimony about the girls' statements to the police. The State asserted that the statements were not for the truth of the matter asserted, but to show "that she's not changed her statement and that she said it before." The court overruled this objection without discussion.

{¶ 44} The basis for the court's decision to overrule the hearsay objection is unclear from the record. The court may have viewed the girls' statements the night of the altercation as "excited utterances," to which a hearsay exception applies, Evid.R. 803(2), or as a prior consistent statement that was allowable under Evid.R. 801(D)(1)(b), but it did not

state the basis for its ruling on the record.

{¶ 45} Appellate courts presume that a trial court only considered relevant and admissible evidence in a bench trial. *See White v. White,* 2d Dist. Clark No. 2013 CA 86, 2014-Ohio-1288, ¶ 11; *State v. Schillo*, 8th Dist. Cuyahoga No. 100080, 2014-Ohio-2262, ¶ 41, citing *State v. Post*, 32 Ohio St.3d 380, 384, 513 N.E.2d 754 (1987). When the trial court is the trier of fact, the judge is presumed capable of disregarding improper hearsay evidence, and unless it is demonstrated that the court relied on inadmissible hearsay, a conviction will not be reversed. *Id.*, citing *State v. Crawford*, 8th Dist. Cuyahoga No. 98605, 2013-Ohio-1659. The girls testified at trial and were subject to cross-examination, and the judge was able to observe them and assess their credibility. There is no evidence in the record that the trial court improperly relied on the mother's testimony, and we are unpersuaded that Rowe was prejudiced by its admission.

{¶ 46} The third assignment of error is overruled.

{¶ 47} The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J., and WELBAUM, J., concur.

Copies mailed to:

Amy B. Musto
Carl Bryan
Hon. Deirdre E. Logan